[No. D013930. Fourth Dist., Div. One. Sept. 30, 1992.]

STEPHANIE F. SACHS et al., Plaintiffs and Appellants, v.
EXXON COMPANY, U.S.A. et al., Defendants and Respondents.

COUNSEL

Gruber & Sachs, Michael B. Sachs, Meserve, Mumper & Hughes and Andrew K. Ulich for Plaintiffs and Appellants.

Ferris & Britton, Allan J. Reniche, Sullivan, Hill, Lewin & Markham and Frank J. Fox for Defendants and Respondents.

OPINION

BENKE, J.—

### INTRODUCTION

In this case landlords, plaintiffs and appellants Stephanie F. Sachs and Michael B. Sachs, asked their tenants, defendants and respondents Exxon Company, U.S.A. (Exxon), and Texaco Refining & Marketing, Inc. (Texaco), for permission to conduct tests at the gas station which Exxon and Texaco have operated on the Sachses' property for a number of years. The Sachses advised the oil companies an environmental expert the Sachses have retained believes there is evidence of soil contamination on the property and further investigation is needed.

The oil companies refused to allow the Sachses to conduct the additional tests proposed by the Sachses' expert. The Sachses' complaint seeks a declaration of their right to conduct the disputed tests. The oil companies moved for judgment on the pleadings or in the alternative summary judgment.

The trial court granted the oil companies' motion for summary judgment. We reverse. We reject the oil companies' argument the Sachses must wait until the end of the lease term before taking any action to assure protection of their interest in their land.

FACTUAL AND PROCEDURAL BACKGROUND

1. *History of the Tenancy*

In 1967 the Sachses' predecessor in interest, Arthur L. Sachs, Inc., leased the subject property to Humble Oil and Refining Co. (Humble) for a term of 20 years. The lease also provided Humble with three 5-year options.[1]

By August 1988 Exxon had succeeded to Humble's interest in the lease, and the Sachses had succeeded to Arthur L. Sachs's fee interest in the land. On September 9, 1988, the Sachses advised Exxon by letter that Enviropro, Inc. (Enviropro), an environmental and hazardous waste engineering firm retained by the Sachses, had inspected the gas station and had recommended that further investigation be conducted to evaluate the potential existence of subsurface contamination at the site. The September 9 letter asked Exxon to provide the Sachses with the results of any tests Exxon had performed at the gas station.

By September 26, 1988, the Sachses had received no reply from Exxon and again wrote to the company. In their September 26 letter the Sachses included a copy of an engineering report prepared by Enviropro. The Sachses' letter also asked Exxon to "provide us with specific dates and times sufficient to permit the next step in leak detection for soil contamination. We are advised by Enviropro that they will test the tank system for leaks by performing a tank precision test on each of the two tanks. This site investigation to evaluate the potential existence of subsurface contamination shall include soil borings and direct soil sampling at several locations and depths, and chemical analysis of soil and/or ground water samples. [¶]We are thereby requesting the cooperation of Exxon in the determination of the extent of potential soil and subsurface water contamination by providing us with the dates and times acceptable to Exxon within the next thirty days, that will be the least intrusive and cause the least amount of inconvenience."

On October 18, 1988, Exxon responded to the Sachses' request. In its response Exxon stated that it had consulted its field engineering personnel and "it is their opinion that the 8/18/88 Enviropro, Inc. report is not conclusive; and, since Exxon's data suggests that no environmental problem exists, Exxon sees no necessity for initiating an in-depth investigation. [¶] With regard to your request for another investigation, Exxon has a right to 'quiet enjoyment' of the property and has already allowed you an opportunity to examine the property. Any further incursion on the property would

---

[1]Under the lease Humble was obligated to pay $760 a month for the property. The lease did not provide for any increase in the rent during the term of the lease or the options. The lease did provide for a gallonage override which in 1989 generated an additional $4,639 in rent.

violate Exxon's right to quiet enjoyment. Any right you might have with regard to determining 'waste' would arise at the end of the term of the lease." Exxon's letter also informed the Sachses Exxon had agreed to assign its interest in the lease to Texaco and that the transaction between Exxon and Texaco was scheduled to close before the end of October 1988.

### 2. *Litigation*

On October 27, 1988, the Sachses filed a complaint for declaratory relief in which they named Exxon and Texaco as defendants. The Sachses sought a judicial determination they had the right to enter onto their property for the purpose of determining whether the oil companies had committed waste on the property and for a determination the oil companies had forfeited the lease by refusing to permit an inspection.

During 1989, while the Sachses' lawsuit was pending, Texaco retained an environmental consulting firm, Emcon Associates (Emcon), to conduct a number of tests at the gas station. Texaco made Emcon's reports available to the Sachses, and the Sachses in turn asked their environmental engineer, Enviropro, to review Emcon's reports. In an October 20, 1989, letter to the Sachses, Enviropro criticized Emcon's reports. According to Envirpro "Soil contaminated by gasoline was found in only one boring. Only four borings were made and four soil samples analyzed; this is not enough to determine whether the soil contains areas of substantial contamination. Indeed, it has been our experience that when groundwater is found to be contaminated at the levels such as is found at this site, there are nearly always areas of substantial vadose zone contamination." Enviropro concluded "Enviropro, Inc. believes there to be a definite need for further remedial investigation at this site to determine the extent and impact of the gasoline contamination. We also believe that remedial action will have to be taken to clean the contaminated groundwater, remove contaminated soil, and make necessary repairs/modifications to prevent further release. Off-site migration of the contaminants may have already occurred, raising concerns of further liability. We recommend additional investigation as a first phase in solving these problems."

On March 1, 1990, Exxon and Texaco moved for judgment on the pleadings or in the alternative for summary judgment. The trial court granted the oil companies' motion for summary judgment and a judgment dismissing the Sachses' complaint was entered.[2] The Sachses filed a timely notice of appeal.

---

[2]The trial court denied as moot the oil companies' motion for judgment on the pleadings.

ISSUES ON APPEAL

The principal issue the parties contest on appeal is whether the Sachses have any right to inspect the gas station. On this record we find the Sachses may have such a right. Whether the right exists involves questions of disputed facts which cannot be resolved, on this record, by summary judgment. We therefore reverse the judgment.

DISCUSSION

I

■ We begin by restating familiar principles which govern our review following entry of summary judgment: "The purpose of a summary judgment motion is to determine if there are any triable issues of material fact, or whether the moving party is entitled to judgment as a matter of law. [Citations.] The summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. [Citation.] The affidavits of the moving party are strictly construed, while those of the party opposing the motion are liberally construed. [Citations.] If the affidavits of the party opposing the motion contain factual averments within the general area of the issues framed by the pleadings, they are sufficient to make out a prima facie case. [Citation.] Any doubts as to the propriety of granting the motion must be resolved in favor of the party opposing the motion. [Citations.]" (*Cascade Gardens Homeowners Assn.* v. *McKellar & Associates* (1987) 194 Cal.App.3d 1252, 1255-1256 [240 Cal.Rptr. 113].) With these principles in mind, we turn to the Sachses' rights under the lease.

II

■ The parties would have us resolve this dispute by setting forth new and broad principles of landlord-tenant law, as affected by new environmental hazard legislation. We find it possible, however, and more prudent, to determine the landlord's rights by reference to the provisions of the lease, specifically paragraph 6 thereof which provides: "Lessee's use of said premises shall comply with all ordinances and laws and all lawful rules and regulations of competent governmental authorities applicable to said premises and the business conducted thereon."

Paragraph 6 itself does not expressly address the question of whether the Sachses have the right to conduct the inspection suggested by their expert.

Nonetheless paragraph 6 does address the larger interest the Sachses are seeking to vindicate: freedom from potential liability under a myriad of federal, state and local statutes which regulate the disposal and cleanup of toxic wastes.[3]

In particular, we note that at least one court has found gasoline leakage from an underground storage tank will support a cause of action under the Resource Conservation and Recovery Act (RCRA). (42 U.S.C.A. § 6901 et seq.) (See *Zands* v. *Nelson* (S.D.Cal. 1991) 779 F.Supp. 1254, 1261; 42 U.S.C.A. § 6972(a)(1)(B).) Liability under the RCRA may be imposed without regard to fault on parties who have owned land during any period gasoline was stored on the land. (*Zands* v. *Nelson* (S.D.Cal. 1992) 797 F.Supp. 805, 809-810.) We also note Health and Safety Code section 25359.7 imposes liability on an owner of nonresidential real property who knows, or has reasonable cause to believe, that there is hazardous substance on or under the property and fails to notify a potential buyer or lessee. (Health & Saf. Code, § 25359.7, subd. (a).) Subdivision (b) requires the lessee to notify the owner where the lessee knows or has reasonable cause to believe there is hazardous substance on the property. When the lessee fails to give such notice, the lessee is in default which will result in termination of the lease unless the lessee takes appropriate remedial steps to deal with the hazardous waste.

With respect to these potential[4] violations of law and the Sachses' potential liability, the defendants have not shown as a matter of law that no violation has occurred. The Sachses have alleged contaminants from operation of the gasoline storage tanks may have damaged the soil and subsurface water beneath the gas station. Their allegation is supported by their expert's opinion that some contamination has occurred, further contamination is probable and remedial action will likely have to be taken. Thus the record

---

[3]See Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 United States Code section 9601 et seq. (CERCLA); Federal Clean Water Act, 33 United State Code section 1251 et seq.; Carpenter-Presley-Tanner Hazardous Substance Account Act, Health and Safety Code section 25300 et seq.; Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249.5 et seq. (Prop. 65); Oceanside Municipal Code, sections 13.27A, 17A.1(s), 17A.13, 14.68(b); see also Hingerty, *Property Owner Liability for Environmental Contamination in California* (1987) 22 U.S.F. L.Rev. 31.

[4]We recognize that Health and Safety Code section 25317 contains an exclusion for petroleum and petroleum byproducts and that in interpreting an analogous exclusion in CERCLA, one circuit court has found that leaking gasoline is not covered by CERCLA. (See *Wilshire Westwood Assoc.* v. *Atlantic Richfield* (9th Cir. 1989) 881 F.2d 801, 810.) Although we do not express any opinion with respect to the scope of the petroleum exclusion set forth in Health and Safety Code section 25317, we do not think the potential for a narrower interpretation of the exclusion should be ignored, especially here, where the issue we confront is not the parties' actual liability under the various statutes but the Sachses' ability under the lease to protect themselves from later claims by governmental entities or successors in interest.

here shows that liability under state and federal law may exist, the Sachses may be subject to such liability and the defendants may therefore have breached paragraph 6.

What remedies should the Sachses have to guard against or mitigate this potential liability? In considering the interpretation of the lease terms which should afford reasonable protection for the landlord, we should be mindful of the fact that these statutes creating liability, often without fault, for the existence of a hazardous condition, were adopted *after* negotiation of the terms of this lease. We should also recognize that the question of commencement of or tolling of statutes of limitation which might permit action against tenants for ancient pollution is at best a difficult issue. (See, i.e., *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1152 [281 Cal.Rptr. 827].)

■ In leases, as in contracts, a covenant of good faith and fair dealing has been implied. (*Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500-501 [220 Cal.Rptr. 818, 709 P.2d 837].) The covenant requires that neither party do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the lease. (*Ibid.*) ■ One of the benefits provided to the Sachses by this lease is the promise of the defendants that they will not violate governmental laws and regulations which apply to the leasehold. This assurance is of little benefit to the Sachses if they are precluded from assuring themselves that no such violations are taking place, *particularly* in circumstances in which they reasonably suspect violations. Since contamination which would give rise to a violation of environmental law is usually hidden from a layman's view, the means by which a violation can be ascertained requires the use of expert investigation. Thus, good faith and fair dealing as respects the covenant of lawful activity requires a reasonable means by which the Sachses can assure themselves as to the status of environmental hazards which may be the result of the tenant's activities. Such assurance could presumably be provided by tests and reports initiated by the tenant which, from an objective point of view, provide adequate assurance to a landlord. Lacking such tenant action, we would imply a right on the part of the landlord to come upon the premises and conduct testing in a reasonable and nonobstructive manner.

We are not plowing new ground in the field of landlord-tenant law. In a variety of commercial contexts courts have implied rights and obligations where particular leases were otherwise silent. (See *Ellis* v. *Chevron U.S.A., Inc.* (1988) 201 Cal.App.3d 132, 141, fn. 2. [246 Cal.Rptr. 863].) The cases have recognized that such implied covenants can be created only when they are firmly rooted in the parties' express agreement and justified by legal

necessity. (*Ibid.*) Here the assurance we require as to the defendants' activities is based squarely on their obligation to operate the gas station in a lawful manner and the necessity which arises because contamination, regulated by state and federal law, normally cannot be discovered except by way of expert investigation.

Having found in the parties' agreement an implied obligation that the Sachses be able to determine that no laws are being violated, we turn briefly to the question of whether the defendants have met that obligation. The record discloses the defendants have provided the Sachses with a great deal of data from their own expert's investigation. The defendants believe the data provided should have allayed any of the Sachses' reasonable fears. As we have seen the Sachses' expert believes more investigation is required. We have no way of resolving this conflict in the evidence as a matter of law. Hence on remand one question a trier of fact will have to determine is whether the Sachses have already received reasonable assurances from the defendants that no violations are occurring.

If the trier of fact determines further investigation is appropriate, such investigation will be limited to what the trial court determines is reasonably necessary under the circumstances. We raise this point because we wish to make it clear that the implied covenant we have recognized establishes an objective standard of performance; in the absence of an express agreement to the contrary, the Sachses have no right to insist upon satisfaction of any subjective standard of testing or investigation.

In sum then, we must reverse the summary judgment because there are disputed factual issues pertaining to the Sachses' right under the lease to investigate the possible contamination at the gas station.

Judgment reversed and remanded for further proceedings consistent with the views expressed in this opinion.

Wiener, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied October 29, 1992, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied December 17, 1992. Lucas, C. J., and George, J., did not participate therein.