[No. G014002. Fourth Dist., Div. Three. Apr. 21, 1995.]

RESOLUTION TRUST CORPORATION as Receiver, etc., et al., Plaintiffs and Appellants, v.
ROSSMOOR CORPORATION et al., Defendants and Respondents.

## COUNSEL

Maher & Renzi, Cynthia R. Maher, Jeffrey Ehrlich, Cox, Castle & Nicholson and Robert D. Infelise for Plaintiffs and Appellants.

Lewis, D'Amato, Brisbois & Bisgaard, Robert K. Wrede, Charles D. Ferrari and Steven R. Ruth for Defendants and Respondents.

## OPINION

**WALLIN, J.**—Resolution Trust Corporation, the receiver for HomeFed Bank, F.S.B., and 405 Hotel Associates appeal the judgment of nonsuit entered against them by the trial court, contending they established sufficient

proof of their causes of action for nuisance, trespass, and negligence against Rossmoor Corporation and LHC Associates.[1] We affirm.

In July 1972, Rossmoor ground leased property it had owned for several years to Alona-Rey Homes, which subleased it the same day to Trans-Tech, the owner of a gas station on the property. Sometime that year, a substantial leak[2] was found under a fuel dispenser, which was repaired within the next few months. In 1974, Alona-Rey Homes sued the gas station builder on Trans-Tech's behalf for construction defects, based on allegedly defective installation of underground piping.

Nicholas Covelli said he first learned of the 1972 gasoline leak in 1976, although he signed an invoice in 1972 relating to the repairs. William March signed interrogatory responses in 1976 that referred to the 5,000-gallon leak.

In June 1979, Alona-Rey assigned its interest in the ground lease to Trans-Tech. In December 1981 Trans-Tech assigned the ground lease to LHC with an option to purchase that Trans-Tech had obtained from Rossmoor. LHC concurrently subleased the property to Trans-Tech. Sometime that same year, HomeFed purchased from Rossmoor the five-acre parcel adjoining the gas station.

In January 1982, Trans-Tech assigned the sublease and sold the gas station to Emerald Oil. Within three weeks LHC purchased the land from Rossmoor (merging the original lease with the fee, and rendering the sublease a lease), and Rossmoor was soon dissolved. Rossmoor's principals were essentially the same as those of LHC and Trans-Tech.[3]

In October 1983, Emerald Oil assigned its lease to Willbarb Petroleum Carriers, Inc. The next month a diesel leak from the siphon system at the top

---

[1]Ross W. Cortese, Alona W. Cortese, Hedwig A. Marxen, Nicholas J. Covelli, Colleen C. Covelli, William V. March, and Nancy J. March were also sued either individually or as trustees of various family trusts, based on ownership of LHC. Because their liability, if any, is derivative, we will not refer to them separately. 405 Hotel Associates joins in HomeFed's brief, so we will refer to them collectively as HomeFed. The plaintiffs were awarded $4 million in damages against defendants Trans-Tech and Willbarb, who are not parties to the appeal.

[2]The gasoline loss was alleged to be 5,000 gallons.

[3]Ross Cortese was the president and chairman of the board of Rossmoor, and a shareholder. He was also the president, and a director and a shareholder of Trans-Tech, and president, a director and sole shareholder of Alona-Rey Homes, as well as a general partner of LHC. March was the vice-president, a director and shareholder of Rossmoor, treasurer, chief financial officer, and a shareholder of Trans-Tech, a director of Alona-Rey Homes, and managing general partner of LHC. Cortese's brother-in-law, Nicholas Covelli was vice-president and general manager of Trans-Tech, and a partner in LHC.

of a storage tank was discovered, which had resulted in a loss of approximately 10,000 gallons over several months. The Orange County Environmental Management Agency notified LHC of the leak by April 1984. In 1985, 405 Hotel Associates bought the HomeFed property but soon negotiated a repurchase when it learned the property was contaminated by gasoline and diesel fuel, which had migrated onto the HomeFed property.[4] In 1988, the California Regional Water Quality Board issued an order finding LHC and Rossmoor "caused or permitted" the leaks and ordered them to abate the contamination.

█ HomeFed contends it established sufficient proof of its causes of action for nuisance, trespass, and negligence to survive the motion for nonsuit. █ Nonsuits are disfavored. (*Kardly* v. *State Farm Mut. Auto. Ins. Co.* (1989) 207 Cal.App.3d 479, 481 [255 Cal.Rptr. 40].) Appellate courts will not sustain them " ' "unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law." ' " (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

█ HomeFed correctly asserts it proved the fuel leaks caused a continuing nuisance on its property. █ Failure to clean up contamination causing ongoing damage to property has been held to constitute such a nuisance. (*Newhall Land & Farming Co.* v. *Superior Court* (1993) 19 Cal.App.4th 334, 341-343, 345-347 [23 Cal.Rptr.2d 377]; *Capogeannis* v. *Superior Court* (1993) 12 Cal.App.4th 668, 673 [15 Cal.Rptr.2d 796]; *Mangini* v. *Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1133-1137 [281 Cal.Rptr. 827]; *Stoiber* v. *Honeychuck* (1980) 101 Cal.App.3d 903, 919 [162 Cal.Rptr. 194] ["The statutory definition of nuisance appears to be broad enough to encompass almost any conceivable type of interference with the enjoyment or use of land or property."].) █ (4) Likewise, the same conduct gives rise to an action for continuing trespass. (*Mangini* v. *Aerojet-General Corp., supra,* 230 Cal.App.3d at pp. 1141-1142.)

█ But we have found no case holding a lessor landowner liable for either of those torts where the landlord was not an active participant in causing the fuel leak and contamination. In *Capogeannis* v. *Superior Court,*

---

[4]HomeFed's expert opined the gasoline leak migrated to the HomeFed property no later than 1974; the 1983 diesel leak reached the property within several months of November 1983. However, that testimony was given after the judgment of nonsuit, and we will not consider it on appeal. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764].)

*supra*, 12 Cal.App.4th 668, nothing showed the defendant landlord was an active participant in the leak, but neither of the parties contested the issue and the court did not discuss it.[5] (*Id.* at p. 673.) The observation was, at most, dictum. (*People* v. *Foster* (1993) 14 Cal.App.4th 939, 956 [18 Cal.Rptr.2d 1] [a court's comment on an uncontested issue is dictum].) In the three cases the *Capogeannis* court cited for the proposition the landlord might be liable, either the landlord actively participated in causing the damage or the landlord was not a defendant. (*Mangini* v. *Aerojet-General Corp., supra*, 230 Cal.App.3d at pp. 1133-1137 [new owners sued former lessees]; *Stoiber* v. *Honeychuck, supra*, 101 Cal.App.3d at pp. 919-921 [tenant sued owners for dangerous condition they had created]; *Institoris* v. *City of Los Angeles* (1989) 210 Cal.App.3d 10, 20 [258 Cal.Rptr. 418] [tenant sued third party airport]; see also *KFC Western, Inc.* v. *Meghrig* (1994) 23 Cal.App.4th 1167, 1178 [28 Cal.Rptr.2d 676] [former owners operated gas station causing pollution]; *Wilshire Westwood Associates* v. *Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 744 [24 Cal.Rptr.2d 562] [new owners sued former lessee]; *Newhall Land & Farming Co.* v. *Superior Court, supra,* 19 Cal.App.4th at pp. 341-342 [defendant former owners had created the pollution].)

█ The absence of cases finding landowners liable for trespass without their active participation is presumably because trespass requires an act which is intentional, reckless, negligent or the result of ultrahazardous activity. (*Armitage* v. *Decker* (1990) 218 Cal.App.3d 887, 906 [267 Cal.Rptr. 399].) █ And, although it has been said due care is not a defense to a nuisance (see 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 150, p. 830), we have not found recent authority applying that rule to landowners when the nuisance is created by another. Some form of negligence by the landowner is required. (See, e.g., *Henderson Brothers Stores, Inc.* v. *Smiley* (1981) 120 Cal.App.3d 903, 909, fn. 2, 917 [174 Cal.Rptr. 875] [finding the trial court incorrectly granted employer's nonsuit on peculiar risk theory, but holding employer is not liable for independent contractor's nuisance absent negligence]; and see *Mangini* v. *Aerojet-General Corp., supra*, 230 Cal.App.3d at p. 1137 [landowner liable for creating or assisting in creating nuisance].)[6]

█ No evidence shows Rossmoor or LHC actively caused or contributed to the fuel contamination, so the propriety of the nonsuit turns on

---

[5] The case concerned whether the statute of limitations had run.

[6] The only case we have found suggesting a landlord might be strictly liable for a nuisance created by a tenant is *Dennis* v. *City of Orange* (1930) 110 Cal.App. 16 [293 P. 865]. The property owner leased land to a tenant who excavated gravel from a creek bed located on the property, causing the plaintiff's adjoining land to erode. In upholding the landlord's liability for the nuisance the tenant created, the court stated: "It naturally follows that when a landlord renews a lease or re-leases the premises to the same tenant, the very making of a new lease shows that at that time the landlord has a right of entry to the premises, and logically, having

whether HomeFed adequately showed they were negligent. ██ To prevail on a cause of action for common law negligence, the plaintiff must show, among other things: (1) the defendant owed the plaintiff a duty of due care; (2) the defendant breached that duty; (3) the plaintiff suffered injury; and (4) the breach proximately caused the injury. (See *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].)

Traditionally, a lessor owed no duty to third parties concerning dangerous conditions on the premises which came into existence after the tenant took possession. (*Uccello* v. *Laudenslayer* (1975) 44 Cal.App.3d 504, 511 [118 Cal.Rptr. 741, 81 A.L.R.3d 628].) ██ But the law has evolved so ". . . a commercial landowner cannot totally abrogate its landowner responsibilities merely by signing a lease." (*Mora* v. *Baker Commodities, Inc.* (1989) 210 Cal.App.3d 771, 781 [258 Cal.Rptr. 669]; see also *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 467 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601]; *Krongos* v. *Pacific Gas & Electric Co.* (1992) 7 Cal.App.4th 387, 392 [9 Cal.Rptr.2d 124]; *Wylie* v. *Gresch* (1987) 191 Cal.App.3d 412, 418 [236 Cal.Rptr. 552].) "[I]f a landlord has such a degree of control over the premises that it may fairly be concluded that he [or she] can obviate the presence of the dangerous [condition] and he [or she] has knowledge thereof, an enlightened public policy requires . . . imposition of a duty of ordinary care. To permit a landlord in such . . . situation to sit idly by in the face of [a] known danger to others must be deemed to be socially and legally unacceptable." (*Uccello* v. *Laudenslayer*, *supra*, 44 Cal.App.3d at p. 512.)[7]

---

a right to enter and remedy the defect, if he re-leases with the dangerous conditions existing, the usual rule then applies that he is liable for injuries resulting from a condition amounting to a nuisance, which exists at the time the premises are demised. . . . [¶] . . . [¶] 'The ground of the defendant's liability for the nuisance is that it existed at a time when he had the opportunity or power to abate or remove it and failed to do so. When the lease was executed and the term was created, the finding of the jury is that the defect existed. It was then his duty before renewing the lease to have abated the nuisance. It was within his power to do so, and his failure to exercise that power imposes liability.' " (*Id.* at pp. 23-24.)

Although the court appeared to reject the landlord's claim that liability for a nuisance could not exist without negligence, a careful reading of the case reveals the court only declined to require a showing that the landlord actively contributed to creating the nuisance. The case was tried on the theory the landlord knew of the hazard at a time when it could have done something to avoid the harm. (*Dennis* v. *City of Orange*, *supra*, 110 Cal.App. at p. 20.) As we shall discuss, modern cases on landlord liability for hazards created by a tenant have turned on negligence based on knowledge, or at least a reason to know, of the hazard.

[7]This conclusion arises from the legal concept of duty. "Duty is an obligation to take ordinary care under all the circumstances. [Citation.] Duty is primarily a question of law in which the foreseeability of risk to another is an important consideration. [Citations.] Duty 'is the court's "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ' [Citation.] 'Among the criteria for determining whether a landlord acted with ordinary care in the management of his

The defendants claim they had no control over the premises, that they "never had a relevant possessory interest in the raw land; had no right of reentry; and never owned, operated, or controlled the [gas station]." Not so.

Although the defendants generally had no control over the occupation or operation of the premises, they did have a right to reenter on at least three occasions: when LHC entered into its lease with Emerald Oil (*Mora* v. *Baker Commodities, Inc.*, *supra*, 210 Cal.App.3d at p. 781), and when Rossmoor and LHC learned of the leaks. As to the latter, both the original Rossmoor lease in 1972 and the LHC lease in 1982 required the lessee to comply with all municipal, state and federal laws, and provided for a right of termination or reentry upon default. The fuel leaks arguably violated the Porter-Cologne Water Quality Control Act of 1969 (Wat. Code, §§ 13264, subd. (a), 13304), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), and Health and Safety Code section 25299. (See also *Sachs* v. *Exxon Co., U.S.A.* (1992) 9 Cal.App.4th 1491, 1496-1498 [12 Cal.Rptr.2d 237] [lessor has right to enter leased gas station premises to inspect property for fuel contamination, based on implied covenant of good faith and fair dealing].)

But even though the defendants had a right to enter the premises on those occasions, a duty to HomeFed is not necessarily established. "A landlord cannot be held to be responsible for all dangers inherent [even] in a dangerous business." (*Mora* v. *Baker Commodities, Inc.*, *supra*, 210 Cal.App.3d at p. 780 [slaughterhouse].) The defendant must be aware of the specific dangerous condition and be able to do something about it before liability will attach. (*Bisetti* v. *United Refrigeration Corp.* (1985) 174 Cal.App.3d 643, 648-649 [220 Cal.Rptr. 209] [summary judgment affirmed on landlord's declaration he had no knowledge of dangerous vat on premises or hole in the fence]; *Uccello* v. *Laudenslayer*, *supra*, 44 Cal.App.3d at p. 511.)[8]

The landlord also has a duty upon execution of a lease to "inspect the premises to make the premises reasonably safe from dangerous conditions."

property are: the likelihood of injury, the probable seriousness of such injury, the burden of reducing or avoiding the risk, and his degree of control over the risk-creating defect [citation].' [Citations.]" (*Mora* v. *Baker Commodities, Inc.*, *supra*, 210 Cal.App.3d at p. 779.)

[8]Some cases have held constructive knowledge of the condition is enough, essentially placing a duty of inquiry or investigation on the landlord. (See, e.g., *Swanberg* v. *O'Mectin* (1984) 157 Cal.App.3d 325, 331-332 [203 Cal.Rptr. 701].) But that duty only arises "if [the landlord has] some reason to know there [is] a need for such action." (*Mora* v. *Baker Commodities, Inc.*, *supra*, 210 Cal.App.3d at p. 781.)

(*Mora* v. *Baker Commodities, Inc., supra*, 210 Cal.App.3d at p. 781.) But "the landlord's responsibility to inspect is limited. . . . [T]he duty to inspect charges the lessor 'only with those matters which would have been disclosed by a reasonable inspection.' [Citations.] The burden of reducing or avoiding the risk and the likelihood of injury will affect the determination of what constitutes a reasonable inspection. The landlord's obligation is only to do what is reasonable under the circumstances. The landlord need not take extraordinary measures or make unreasonable expenditures of time and money in trying to discover hazards unless the circumstances so warrant. When there is a potential serious danger, which is foreseeable, a landlord should anticipate the danger and conduct a reasonable inspection before passing possession to the tenant. However, if no such inspection is warranted, the landlord has no such obligation." (*Id.* at p. 782.)[9]

Rossmoor had no duty to enter and inspect at the outset of the lease merely because a gas station was to be operated and some potential for leakage is inherent in the business. (See *Mora* v. *Baker Commodities, Inc., supra*, 210 Cal.App.3d at p. 780 [slaughterhouse].) There was no showing the gas station or storage system was in place to be inspected at that time. The only thing Rossmoor could have done to prevent the later damage was to refuse to rent to a gas station. That course of action would be unreasonable for the landlord and for a society which depends on gas stations to function.[10]

And, neither Rossmoor nor LHC was negligent for failing to terminate the lease or perform rigorous testing when they learned of the leaks. "Among the criteria for determining whether a landlord acted with ordinary care in the management of [the] property are: [1] the likelihood of injury, [2] the probable seriousness of such injury, [3] the burden of reducing or avoiding the risk, and [4] [the landlord's] degree of control over the

[9]In this context, the concept of foreseeability is an objective one. As the court noted in *Krongos* v. *Pacific Gas & Electric Co., supra*, 7 Cal.App.4th 387, "We stress, however, that we find the injury 'foreseeable' only as it pertains to a general duty of care. '[A] court's task—in determining "duty"—is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.' [Citations.]" (*Id.* at p. 394, italics omitted.)

[10]*Krongos* v. *Pacific Gas & Electric Co., supra*, 7 Cal.App.4th 387 does not stand for a contrary proposition. The court observed the landlord *could* have discharged his duty to protect third parties from dangerous power lines by refusing to rent to a company which operated boom trucks or cranes that could come in contact with the lines. (*Id.* at p. 395.) The court did not say this was a necessary course of action as a matter of law. We find nothing in the law suggesting the owner has a duty not to rent property due to a *potentially* dangerous activity.

risk-creating defect [citation]." (*Evans* v. *Thomason* (1977) 72 Cal.App.3d 978, 984-985 [140 Cal.Rptr. 525]; see also *Mora* v. *Baker Commodities, Inc.,* *supra,* 210 Cal.App.3d at p. 779.)

■ Applying those factors here, three of them weigh heavily in the landlords' favor.[11] As to the first factor, all evidence suggests both leaks were promptly remedied, and HomeFed did not show the likelihood of additional leakage was high.[12] Nothing showed that when Rossmoor learned of the 1972 spill four years after it occurred, it knew or should have known the spill contaminated or was likely to contaminate adjoining property. Similarly, when LHC entered into the lease, no evidence showed it knew or should have known the HomeFed property was damaged or was likely to be damaged. And, as with Rossmoor, no evidence shows that when LHC learned of the 1983 spill, it knew or should have known the spill contaminated or was likely to contaminate the adjoining property.[13]

The third factor is the burden of reducing or avoiding the risk. To say the only way to satisfy this burden is automatic termination of the lease or frequent and rigorous inspections, as HomeFed implies, would be unreasonable. ■ Notwithstanding the *power* of a landlord to enter property to investigate spills (*Sachs* v. *Exxon Co., U.S.A., supra,* 9 Cal.App.4th at pp. 1496-1498), as a matter of public policy, we will not place a duty on the landlord to do extensive and expensive soil testing to determine whether a spill has migrated to adjoining property. A landlord's duty to act arises only if the landlord knows or has reason to know the leakage has not been stopped or damage to adjoining property is imminent and avoidable. That is particularly true where, as here, the landlord has limited control over the property. Thus, the last factor also favors Rossmoor and LHC.

■ At most, upon learning of a leak, Rossmoor and LHC had a duty to ascertain whether the leaks had been corrected, and whether damage to third parties was imminent and preventable. No evidence showed they breached such a duty.

Even if the defendants had a duty after the leaks occurred and breached it, HomeFed failed to show the breach caused its injury. (See *Weirum* v. *RKO*

---

[11]Only the second factor favors HomeFed. Soil contamination from petroleum products is a serious injury.

[12]Indeed, as far as the record shows, the leaks here were unrelated.

[13]HomeFed stresses the identity of ownership among Rossmoor and Trans-Tech gives rise to an inference that Rossmoor knew of the 1972 leak as soon as it happened. The "inference" is more in the nature of sheer speculation. And, to the extent Rossmoor knew of the leak immediately, nothing shows it had any idea the spill would migrate to what would later become HomeFed's property.

*General, Inc., supra,* 15 Cal.3d at p. 46.) Rossmoor did not learn of the first leak for about four years, and LHC did not learn of the second for about six months. HomeFed failed to show the migration to its property occurred after Rossmoor and LHC knew, which was a prerequisite for Rossmoor and LHC to *prevent* it.

■ As an alternate theory, HomeFed argues a duty was created by the California Regional Water Quality Board's order. In its opening brief, HomeFed argued the cleanup order established duty as a matter of law, citing 6 Witkin, Summary of California Law, *supra,* Torts, section 821, page 174 and Evidence Code section 669. It also argued the defendants were collaterally estopped to dispute the Water Quality Board's findings, and presumably the "duty" it imposed, citing *People* v. *Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321].

The defendants responded the doctrine of negligence per se could only be applied to safety orders and regulations, and not to this order. They also contended HomeFed was not an entity the order was intended to protect. (See *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 763 [91 Cal.Rptr. 745, 478 P.2d 465] [statute or regulation creates duty only as those it was intended to protect].) Finally, they argued HomeFed had not set forth the conditions for collateral estoppel as set forth in *People* v. *Sims, supra,* 32 Cal.3d at page 479. In its reply brief, despite its prior citations, HomeFed argued it was not relying on the negligence per se doctrine, but was merely arguing a duty had been established by the Water Quality Board Order.

The order created a duty to clean up the spill, and HomeFed is certainly an entity the order seeks to protect. (See *Newhall Land & Farming Co.* v. *Superior Court, supra,* 19 Cal.App.4th at pp. 347-348.) But that does not mean HomeFed established the defendants engaged in tortious conduct *before* the order issued, or that a duty existed prior to the order. The order stated "LHC Associates and Rossmoor Corporation have caused *or permitted* wastes to be discharged . . . ." (Italics added.) It did not purport to find or adjudicate whether the defendants had a duty to prohibit the leakage from reaching HomeFed's property in the first place. And even if it did, HomeFed failed to establish on the record that any of the requirements for collateral estoppel in *People* v. *Sims, supra,* 32 Cal.3d at page 479 had been met.

At most, the order required the defendants to clean up the contamination on HomeFed's property. HomeFed did not show the defendants failed to comply.[14]

The judgment is affirmed.

Sills, P. J., and Sonenshine, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 27, 1995.

---

[14]After the nonsuit was granted, evidence was presented showing that pursuant to the remedial action plan, virtually all of the free product in the plume had been removed and the cleanup was moving into its next phase.