Henry **HENDLER, et al., Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 456–84L.

United States Court of Federal Claims.

July 16, 1997.

Paul R. Hamilton, Los Angeles, CA, for plaintiffs.

David F. Shuey, Washington, DC, for defendant. Eric S. Gould, Justice Department, Washington, DC, and Laurie J. Williams, Environmental Protection Agency, San Francisco, CA, of counsel.

## DAMAGES OPINION

ROBINSON, Judge.

This Opinion shall be read in conjunction with the court's Opinion on liability, *Hendler v. United States*, 36 Fed.Cl. 574 (1996). The damages phase of trial in this takings case was held March 17 and 18, 1997 in Pasadena, California. For the reasons set forth below, the court finds that plaintiffs are not entitled to compensation from defendant for the well easements on their property.

### Background

This takings case concerns the installation of wells to monitor and determine the extent of groundwater contamination underlying plaintiffs' property. Following the liability phase of trial, the court determined that a physical taking of twenty well easements occurred on plaintiffs' property. 36 Fed.Cl. at 584. The court found that each well easement comprises a 50 by 50 foot square area for activities related to the wells contained therein with a 16–foot wide access corridor to a public right of way. *Id.* The court further found that in some instances a single 50–foot square easement may accommodate an entire well cluster. *Id.*

The liability phase of trial was held in 1995. Despite the bifurcation of the liability and damages phases of trial, this court heard extensive damages evidence during the liability phase without objection. The court received ample evidence presented by both parties at the liability phase concerning the alleged economic impact and stigma of the wells and the effect of the EPA access order on plaintiffs' property. 36 Fed.Cl. at 586. The court determined that the access order did not have an adverse economic impact on the value of plaintiffs' property and did not prevent development of the subject property. *Id.* at 588–89. The court found that the "evidence shows that the value of plaintiffs' property was reduced by the contamination, rather than by the actions pursuant to the access order." 36 Fed.Cl. at 588. The court also concluded that the actions taken pursuant to the access order "restored value to plaintiffs' property and increased its marketability and financeability." *Id.* Furthermore, the court found that the well easements "do not materially interfere with the property's day-to-day use, even in those areas occupied by the wells." *Id.* at 584. The court left the value of the well easements and any "special benefits" for the damages phase of trial.

### Contentions of the Parties

Plaintiffs disagree with the court's holding that the nuisance exception applies to their

regulatory taking claim. Plaintiffs argue that property underlain by contaminated groundwater is not subject to any California nuisance restrictions. Plaintiffs maintain that there is no nuisance because they did not create the groundwater contamination. According to plaintiffs, no principles of California law would allow the State or the EPA the powers the EPA gave itself by the 1983 access order.

Plaintiffs contend that the court's allowance of special benefits evidence during the damages phase of trial was in error. According to plaintiffs, if benefits were provided through the government's activities, they were general to the community at large and not special to plaintiffs. Plaintiffs maintain that the State of California has complete liability for costs of investigation and remediation of the contamination in the groundwater, and, therefore, they did not receive a special benefit from the government's actions.

Plaintiffs argue that this court has set a "gold standard" on appraisers. Plaintiffs contend that defendant's experts, Verne Cox and Peter Patchin, are unqualified to render an opinion in this matter. According to plaintiffs, Mr. Patchin's hypothesis that properties overlying contaminated groundwater are stigmatized and suffer a diminution in value is contrary to the facts in this case. Plaintiffs maintain that California does not recognize a diminution in property value for stigma from groundwater contamination.

According to plaintiffs' expert, Peter Finnerty, the remainder of their property not taken suffered severance damages. Plaintiffs argue that the wells constrained development due to the need to obtain approvals from additional government agencies that would not normally be contacted for approval. In addition, Mr. Finnerty estimates that the cost to redesign a development project to provide for the well easements ranges from $5,000 to $20,000. Finally, plaintiffs contend that stigma from the well easements adversely affected the development, marketability, and financeability of their property.

In response to plaintiffs' argument regarding the nuisance exception, defendant contends that contaminated groundwater is a nuisance under California law. Defendant argues that even though plaintiffs were not responsible for the contaminated groundwater migrating under their property, the pre-existing limitation which allows entry onto property for the purpose of abating a nuisance still applies. A regulatory action to abate a nuisance is not a taking.

Defendant contends that the special benefits conferred on plaintiffs' property as a result of the investigation, characterization, and remediation of the groundwater contamination far exceeded any diminution in value attributable to the monitoring well and access easements. Defendant argues that the amount of any compensation owed for the part physically taken must be reduced by the offsetting special benefit to the remainder.

Defendant maintains that Mr. Finnerty's opinions are in conflict with the court's rulings and are not based on credible evidence. Defendant contends that Mr. Finnerty's reliance on only those parts of the record provided by counsel and his failure to do any independent research discredit his conclusions. According to defendant, Mr. Finnerty's valuation of the part taken is inflated because it is based on flawed assumptions. Defendant challenges Mr. Finnerty's opinion on severance damages as contrary to the court's findings, unsupported by any market evidence, and based on his own interpretation of the impact of the EPA access order. Finally, defendant points out that Mr. Finnerty's conclusions are belied by his prior appraisals of contaminated property.

## DISCUSSION

### I. Threshold Issues

Before the court discusses the calculation of damages in this case, there are a few threshold issues that need to be addressed. The court will discuss the nuisance exception, the allowance of special benefits evidence, and the so-called "gold standard" on appraisers.

### A. Nuisance Exception

■ Plaintiffs argue that the court erred in holding that the EPA's actions fell within

the nuisance exception, which was one of the bases for finding that no regulatory taking had occurred. Plaintiffs contend that the contaminated groundwater on their property is not subject to nuisance restrictions because the contamination was caused by others.

■ The rationale for the nuisance exception is that, in acting to protect public health and safety, the government is merely exercising its rights under a pre-existing limitation on the use of private property. Because a property owner does not have a right to use his property in a manner harmful to public health or safety, the government's exercise of its powers to protect public health or safety does not constitute a compensable taking of any of the owner's property rights. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1029 & n. 16, 112 S.Ct. 2886, 2900 & n. 16, 120 L.Ed.2d 798 (1992); *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1178–79 (Fed.Cir.1994); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 480, 107 S.Ct. 1232, 1239, 94 L.Ed.2d 472 (1987); *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978); *Allied–General Nuclear Servs. v. United States,* 839 F.2d 1572, 1576 (Fed.Cir.1988); *B & F Trawlers, Inc. v. United States,* 27 Fed. Cl. 299, 304–05 (1992). The court notes that the nuisance exception was clarified in *Lucas* and *Loveladies,* which were decided after the Federal Circuit's 1991 *Hendler* decision holding that plaintiffs had suffered a physical taking of their property. *See Hendler v. United States,* 952 F.2d 1364, 1378 (Fed.Cir. 1991). It is the duty of the Federal Circuit to reconsider its previous holding in the light of the clarified nuisance exception.

California law broadly defines nuisance. "Anything which is injurious to health, ... or

is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, ... is a nuisance." Cal. Civ.Code § 3479 (West 1997). A public nuisance under California law is defined as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." *Id.* § 3480.

Under the California Health and Safety Code, the presence of contaminated groundwater is a public nuisance. The Health and Safety Code provides, "The Legislature finds and declares that a threat to the public health and safety exists wherever there is a discharge, spill, or presence of hazardous substances on public or private property...." Cal. Health & Safety Code § 25400.[1] At the time of well installation, tests showed that a plume of contaminated groundwater extending several thousand feet in length was flowing directly under plaintiffs' property and was moving south down Pyrite Canyon, where it threatened to poison the drinking water supplies of thousands of residents. Electromagnetic conductivity tests also indicated that this plume of contamination was flowing directly under plaintiffs' property. The EPA and the State had approached Mr. Hendler in August 1983 regarding the installation of wells to monitor the groundwater contamination emanating from Stringfellow but were refused access. The plume of contaminated groundwater contained high concentrations of toxic chemicals that could cause neurological impairment, liver and kidney damage, and, at high concentrations, death. The installation of the wells was a necessary first step to determine the plume's parameters in order to effectively abate the nuisance posed by the contaminated groundwater.

---

1. California has a specific provision in its Water Code concerning public nuisances involving water pollution. In the Water Code, nuisance is defined as follows:

"Nuisance" means anything which meets all of the following requirements:

(1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.

(2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.

(3) Occurs during, or as a result of, the treatment or disposal of wastes.

Cal. Water Code § 13050(m).

Persons who have not created the nuisance may be liable for it under California law. Not only is the party who created or assisted in the creation of the nuisance responsible for ensuing damages, but also the party who maintains the nuisance. *Newhall Land & Farming Co. v. Superior Court,* 19 Cal.App.4th 334, 23 Cal.Rptr.2d 377, 382 (1993). Under the common law, liability for a public nuisance may result from the failure to act. *Leslie Salt Co. v. San Francisco Bay Conservation & Dev. Comm'n,* 153 Cal. App.3d 605, 200 Cal.Rptr. 575, 584 (1984) (citing Restatement (Second) of Torts § 839).[2] Liability for a public nuisance does not require affirmative conduct. *Id.*

Knowledge of the contamination is an important factor in determining liability. In *People v. Southern Pac. Co.,* 150 Cal.App.2d Supp. 831, 311 P.2d 200 (Dep't Super.Ct.1957), defendant was convicted of violation of a law, which prohibited the discharge of contaminants into the air. Even though defendant was not responsible for the creation of the discharge, there was a duty to control the discharge of contaminants. The court held that:

> [T]he owner or person in control of real property who has notice or knowledge that a continuing condition exists on such property which violates the said smog law and who thereafter fails to use reasonable care to abate such condition, is liable therefor in the same manner as the one who first created it.

*Id.,* 311 P.2d at 201.

Similarly, in *Leslie Salt Co.,* a landowner was required to remove fill material which had been placed on its property by unknown third persons. 200 Cal.Rptr. at 586. Using common law nuisance principles, the court reasoned that an owner of land, which independently knows or should know of the existence of several thousand tons of fill material

on its land, and which has received notice thereof from the Bay Conservation and Development Commission, has the duty to control such placement. *Id.* at 585.

Plaintiffs rely on two California cases for the proposition that the nuisance exception is inapplicable in their case. Plaintiffs argue that the Supreme Court of California has held that all water within the State is the property of the people of the State. *See AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). Plaintiffs reason that because they are not the owners of their groundwater, they do not have a duty by reason solely of such ownership to remediate or abate a nuisance. The court is not persuaded by *AIU. AIU* is an insurance interpretation case, not a nuisance case. *AIU* concerned whether environmental clean-up costs were covered by certain insurance policies. *AIU* is not helpful in determining the scope of California's nuisance law.

Plaintiffs next rely upon *Resolution Trust Corp. v. Rossmoor Corp.,* 34 Cal.App.4th 93, 40 Cal.Rptr.2d 328 (1995), for the proposition that a property owner cannot be compelled to abate or remediate a nuisance if the property owner was not the cause of the nuisance. In *Resolution Trust,* the court held that landlords could not be held liable for continuing nuisance or trespass due to leaks from underground storage tanks, absent a showing that the landlords were active participants or negligent in causing the leaks and contamination. *Id.,* 40 Cal.Rptr.2d at 331. The court noted that modern cases on landlord liability for hazards created by a tenant have turned on negligence based on knowledge, or at least a reason to know, of the hazard. *Id.* In *Resolution Trust,* defendants did not have a reason to know of the hazard. *Id.* at 334. Unlike *Resolution Trust,* in the instant case, Mr. Hendler was made aware in August 1983

---

**2.** Section 839 of the Restatement (Second) of Torts states that:

A possessor of land is subject to liability for a nuisance caused while he is in possession by an abatable artificial condition on the land, if the nuisance is otherwise actionable, and
(a) the possessor knows or should know of the condition and the nuisance or unreasonable risk of nuisance involved, and

(b) he knows or should know that it exists without the consent of those affected by it, and
(c) he has failed after a reasonable opportunity to take reasonable steps to abate the condition or to protect the affected persons against it.

of the environmental problems created by Stringfellow and the preliminary tests indicating that the plume of contaminated groundwater was migrating underneath plaintiffs' property.

Moreover, plaintiffs misconstrue defendant's position regarding the nuisance exception. According to plaintiffs, defendant's contention is that plaintiffs had a duty to pay for the costs of investigation and remediation of the groundwater contamination underlying their property or a duty to abate this public nuisance. Rather, defendant's position is that plaintiffs had a duty to provide access to their property for the abatement of a public nuisance.

■ California recognizes that damage from a legitimate exercise of the State's police power is noncompensable. In *Brown v. State*, 21 Cal.App.4th 1500, 26 Cal.Rptr.2d 687 (1993), the court found that no compensation was due for the State's clean-up activities on private property. *Id.*, 26 Cal.Rptr.2d at 689–90. Preventing water pollution was found to be a legitimate exercise of the State's police power. *Id.* at 690. The court determined that the State had acted to protect public health and owed no compensation for a taking under the California Constitution. *Id.* at 689–90.

The California statutory law and case law show that there was a preexisting limitation on plaintiffs' property rights for the abatement of a nuisance. The plume of contaminated groundwater underneath plaintiffs' property, which was migrating down gradient toward the Glen Avon community and threatening to contaminate the Chino III groundwater basin, constituted a nuisance that needed to be abated.

**B.** *Allowance of Special Benefits Evidence*

■ When only a portion of property is taken, the amount of compensation owed is reduced by any direct, special benefits from the government action to the remainder of the property. *Bauman v. Ross*, 167 U.S. 548, 574–75, 17 S.Ct. 966, 976–77, 42 L.Ed. 270 (1897). Special benefits are deducted from any compensation due, and general benefits are not. *Id.; City of Van Buren v. United States*, 697 F.2d 1058, 1062 (Fed.Cir. 1983); *Laughlin v. United States*, 22 Cl.Ct. 85, 111–12 (1990). Special benefits inure specifically to plaintiff, rather than to the community at large. *Laughlin*, 22 Cl.Ct. at 112. Special benefits do not become general because other lands in the area are similarly benefited. *Id.*

■ Plaintiffs contend that under California law special benefits cannot offset the value of the land taken but can offset only severance damages. *See Ventura County v. Thompson*, 51 Cal. 577, 579 (1877). This court, however, holds that federal law, not state law, applies to special benefits. *See Bartz v. United States*, 224 Ct.Cl. 583, 633 F.2d 571, 576–77 (1980) (holding that federal law, rather than Iowa law, applied to special benefits analysis).

Plaintiffs contend that the court's allowance of special benefits evidence during the damages phase of trial is a punitive measure against them. Before this court amended its October 9, 1996 Opinion, the court determined that plaintiffs were entitled to $14,500, without a deduction for any benefit to plaintiffs from defendant's remediation efforts. The determination regarding damages was eliminated following the court's November 26, 1996 Order on Reconsideration. In another Order, dated November 25, 1996, the court ordered that it would apply the special benefits analysis as part of its damage determination. The court allowed special benefits evidence because defendant had correctly pointed out that the court had found certain direct benefits in its October 9, 1996 Opinion. Specifically, the court found that had a private party undertaken the same tests and analyses of the groundwater contamination as part of a plan of development, such efforts would have cost at least $100,000. *Hendler v. United States*, 36 Fed.Cl. 574, 587 (1996). Furthermore, the court found that the EPA's and the State's actions enhanced the value of plaintiffs' property. *Id.* at 588. The court did not determine the value of the enhancement to plaintiffs' property. The quantification of this enhancement in value was left for the damages phase of trial.

## C. *"Gold Standard" on Appraisers*

Plaintiffs argue that this court required expert appraisers to have experience appraising the impact of monitoring wells. Plaintiffs maintain that this court in its October 9, 1996 Opinion created a so-called "gold standard" applicable to the qualifications of expert appraisers who testified about the value of the well easements and access corridors on the subject property. Plaintiffs point to language in a footnote in the court's liability Opinion, which was eliminated when the court amended that Opinion on November 26, 1996. In the unamended Opinion, the court determined that the well easements were worth $14,500. The footnote explained why the court chose defendant's expert's value of the well easements as the amount of damages for the physical taking. The footnote at issue reads in pertinent part:

> Testimony about the value of the well easements was presented at trial. Defendant's expert, Mr. Cox, prepared estimates of the value for the subject property as if uncontaminated and analyzed the value of the well easements and access corridors for each of the 20 wells on plaintiffs' property. Mr. Cox found the combined value of these easements was approximately $14,500 using his uncontaminated values for the subject property on the date each well was installed. [Liability] Tr. 5072–81. Plaintiffs' appraiser, Mr. Flavell, stated he had no experience appraising the impact of monitoring wells, *and* his report includes no analysis of the impact of the wells on plaintiffs' property. [Liability] Tr. 2123.

*Hendler v. United States,* No. 84–456L, slip op. at 15 n. 12 (Fed.Cl. Oct. 9, 1996) (emphasis added). This court did not set a rigid "gold standard" for evaluating expert appraisers in footnote 12. In the footnote, the court simply noted the reasons why it did not rely upon Mr. Flavell's report. First, he did not have experience appraising the impact of monitoring wells. Second, unlike Mr. Cox's report, Mr. Flavell's report did not have an analysis of the value of the well easements and access corridors on plaintiffs' property. There was no value for the well easements and access corridors in Mr. Flavell's report on which this court could rely in determining

damages. Contrary to plaintiffs' assertion that this court effectively struck Mr. Flavell's opinion, this court accepted him during the liability phase of trial as an expert appraiser of property.

 Plaintiffs contend that the so-called "gold standard" in footnote 12 is the law of the case, and all appraisers testifying about the impact of the well easements and access corridors on the subject property must have experience appraising the impact of monitoring wells. The law of the case doctrine allows the court to preserve judicial resources and foster finality. *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 431 (1984). Although it is true that under the law of the case doctrine the court's factual findings and rulings in its liability Opinion need not be relitigated during the damages phase of trial, footnote 12 in the unamended liability Opinion is no longer the law of the case. On November 26, 1996, this court issued an Order that eliminated footnote 12 from the original liability Opinion. *See Hendler v. United States,* 36 Fed.Cl. 574 (1996). The court, therefore, is not constrained to accept opinions only from expert appraisers with experience appraising monitoring wells.

## II. *Experts' Damage Analyses*

 Two experts testified at the damages phase of trial regarding the value of the well easements and access corridors on plaintiffs' property. The court will review the experts' testimony and reports in turn.

### A. *Mr. Finnerty*

Peter J. Finnerty testified for plaintiffs. Mr. Finnerty has been a real estate appraiser for twenty years. He is a member of the Appraisal Institute, with the MAI designation. Mr. Finnerty has appraised properties with known or suspected contamination. In the past, he has considered the impact of groundwater monitoring wells on the value of property. Mr. Finnerty has limited experience appraising easements and appraising the impact of contamination on the value of real property. Mr. Finnerty has never put a specific dollar amount on a groundwater monitoring well easement until this case. Damages Tr. 28. Nevertheless, the court

accepted Mr. Finnerty as an expert qualified to render an opinion in the damages phase of trial.

### 1. *Value of Part Taken*

Mr. Finnerty appraised the value of the well sites and access easements. Mr. Finnerty determined that the total value of the part taken for the well easements and access corridors as of 1983 was $67,364, and with interest the value totalled $185,000 as of October 1996.[3]

Mr. Finnerty determined that the taking of the well easements was equivalent to the taking of 100% of plaintiffs' property rights and valued the easements at 100% to 200% of the underlying fee value. Damages Tr. 185, 195; PX 2129 at 22. Mr. Finnerty believed that the easements were for the EPA's exclusive use, despite the court's finding that the wells would not interfere with the subject property's day-to-day use. *See Hendler*, 36 Fed.Cl. at 584. If the property were developed to its full commercial potential, parking lots or landscaped areas could be planned to coincide with the clear zones needed for the wells, and the wells could be capped flush with the ground surface.[4] 36 Fed.Cl. at 583. Mr. Finnerty's disagreement with the court's finding was one of his bases for calculating the value of the well easements. Damages Tr. 186–87. Mr. Finnerty's conclusion about the exclusivity of the easements inflates his values.

 In determining that the well easements were exclusive use easements, Mr. Finnerty relied on the activities he believed could occur on plaintiffs' property under the terms of the EPA access order, not on the actual use of the easements. PX 2129 at 22.[5] Plaintiffs' expert, however, admitted that someone interested in developing the proper-

ty would attempt to find out the nature of the monitoring activities and what accommodations could be made. Damages Tr. 193. The court finds Mr. Finnerty's beliefs speculative and contrary to the court's liability Opinion. The court found that the easements require portions of the property to be available for periodic access by the government for groundwater measurement and sampling and "do not materially interfere with the property's day-to-day use, even in those areas occupied by the wells." 36 Fed.Cl. at 583–84. The Federal Circuit found that pursuant to the easement, the government drove equipment upon plaintiffs' property for the purpose of installing and periodically servicing and obtaining information from the wells. *Hendler*, 952 F.2d at 1378. Furthermore, the court already decided the impact of the EPA order itself. 36 Fed.Cl. at 587 n. 14; *Hendler v. United States*, 11 Cl.Ct. 91, 95–96 (1986) (holding that mere issuance of the EPA order was not a taking), *aff'd*, 952 F.2d 1364, 1375 (Fed.Cir.1991). In determining the value of the physical taking, what counts is what the government did, not what the government said it was doing. *Cf. Hendler*, 11 Cl.Ct. at 95–96 (disposing of facial challenge to the EPA access order) (citing *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed.Cir.1983)).

Mr. Finnerty assigned values to the well easements that were up to 200% of the average square foot value of the underlying fee. He assigned these higher values for easements located in highly visible areas of the subject property. Damages Tr. 193–94. Mr. Finnerty relied on his experience to make adjustments for the areas of high visibility. His summary report does not have any analysis of how the adjustments were made or

---

3. The interest factor applied by plaintiffs was an average of 8.73%, utilizing this court's interest rates (averaged) for the period 1986 through the first half of 1992 as a basis. *See Formanek v. United States*, 26 Cl.Ct. 332, 341 n. 11 (1992).

4. Mr. Finnerty's opinion on exclusivity is undercut by a prior appraisal. In the Van Law Food appraisal, monitoring wells were located on the property in parking areas, and there were easements providing access to the wells. DX 958. Even though the access easements precluded construction of any improvements in the ease-

ment areas, Mr. Finnerty found that the access easements were non-exclusive because they were located in parking areas or in existing circulation routes. Damages Tr. 153.

5. Mr. Finnerty considered activities such as extraction and storage in determining exclusivity of the easements, even though such activities did not occur on plaintiffs' property. *See* Damages Tr. 59; JX 590. Mr. Finnerty did not provide a value for the easements based on the activities that actually occurred.

any maps to show the particular areas where he made the adjustments. Damages Tr. 197–98.

Mr. Finnerty developed the square foot areas for the monitoring well and access easements, even though he has no credentials in surveying or engineering. Mr. Finnerty stated that he used Matt Webb's map (DX 743) to calculate his easement areas. Damages Tr. 201. Mr. Webb is a licensed land surveyor and registered engineer who testified for defendant at the liability phase of trial about the easement areas. Mr. Finnerty's total square foot area for the easements was 10,000 square feet larger than the easement area calculated by Mr. Webb and provided to defendant's appraiser, Mr. Cox. Compare PX 2129 at 24 with DX 724 at 364B. Mr. Finnerty could not explain the discrepancy between his easement areas and those of Mr. Webb. Damages Tr. 201–02. The extra 10,000 square feet inflated Mr. Finnerty's values for the easements.

## 2. Stigma

Despite this court's previous finding, Mr. Finnerty found that the groundwater contamination did not impact the subject property's value. See 36 Fed.Cl. at 588. In his summary report, Mr. Finnerty incorporated by reference the sales data from the reports of Mr. Cox and Mr. Flavell. This data concerned sales of uncontaminated property. Mr. Finnerty relied on Mr. Flavell's study of residential home sales in Glen Avon. The study began in 1983, and Mr. Flavell had conceded that the "bounce-back" in the Glen Avon residential market after 1983 was partly attributable to the investigation and remediation of the Stringfellow contamination. Damages Tr. 118; see Liability Tr. 2251. At trial, Mr. Finnerty demonstrated that he misunderstood Mr. Flavell's study. Mr. Finnerty mistakenly believed that Mr. Flavell's study compared prices of homes that were located over the plume of contaminated groundwater with prices of homes that were not. Damages Tr. 97. Mr. Flavell's study compared the relative rates of appreciation for homes in Glen Avon with those in other nearby communities from 1983 onward. Liability Tr. 2158–59, 2167–73. Furthermore, evidence presented by both parties

show that contaminated, developed residential property will recover its value more quickly than undeveloped property. See DX 726 at 551–52; PX 2132 at 3–4. Mr. Finnerty's reliance on Mr. Flavell's residential study undercuts his opinion on the impact of the contamination because the subject property is undeveloped property overlying a plume of contaminated groundwater.

One of the reasons Mr. Finnerty cites for his opinion that the groundwater contamination had no impact on value is that there was no known health threat in 1983 from plaintiffs' property. His belief that there was no health hazard is primarily based upon a limited reading of the testimony of John Wise, the acting Regional Administrator who signed the EPA access order, and Mr. Shahin's report for plaintiffs. During the liability phase, Mr. Wise agreed that he had been informed that the only health hazard was the groundwater contamination. Mr. Wise clarified his testimony by explaining that in the briefings before the EPA order was issued, the only concern was the underlying groundwater, and there was no specific discussion about the air emissions or soil surface contamination on plaintiffs' property. Liability Tr. 2437–38. In fact, there were no analyses of the soil on plaintiffs' property prior to 1983. In 1983, there was insufficient information to determine whether it was safe to develop and use the surface of plaintiffs' property. Liability Tr. 3733–34. Many Glen Avon residents were dependent on groundwater wells for their drinking water, and as a result of the Stringfellow contamination, bottled water was provided to over 300 Glen Avon households while their homes were being connected to the Jurupa Community Services District water supply. Those connections were not completed until 1989. From 1983 through 1987, the remedial investigation of the Stringfellow contamination evaluated whether surface water, soil, and air contamination had spread from the original disposal site. JX 326. Plaintiffs' expert acknowledged that the monitoring wells would help determine whether the groundwater contamination presented a hazard to anyone using the groundwater. Damages Tr. 137.

Mr. Finnerty's admissions that contamination impacts value undercuts his opinion that the groundwater contamination did not affect the subject property's market value. He agreed that contamination could adversely impact the value of property.[6] Damages Tr. 110. Mr. Finnerty admitted that whether a property is improved or unimproved may influence the extent of the impact from contamination. *Id.* He agreed that a knowledgeable buyer in the late 1970s would avoid property with any kind of contamination. *Id.* In his deposition, Mr. Finnerty stated that the market between 1983 and 1987 was not sophisticated enough to distinguish between contaminated soils and contaminated groundwater. *Id.* at 112. Furthermore, Mr. Finnerty admitted that from 1983 through 1986, the level of market acceptance of sites associated with any kind of contamination, whether real or perceived, was very low. *Id.* at 112–13. For the most part, Mr. Finnerty agreed that properties perceived to be contaminated would have been unsalable from 1983 through 1986. *Id.* at 113; *see* PX 2129 at 35.

Mr. Finnerty testified that he disagreed with the opinion concerning contamination stigma presented by defendant's expert, Mr. Patchin.[7] Plaintiffs' expert, however, did not review Mr. Patchin's report or testimony in this case. Damages Tr. 129. Mr. Finnerty conceded that he did not know enough about Mr. Patchin's specific opinion in this case to agree or disagree. *Id.* at 96. Plaintiffs' expert's testimony regarding Mr. Patchin's general opinion on the impact of contamination on a property's value is of little help to this court.[8] Mr. Finnerty should have reviewed Mr. Patchin's report in this case before attempting to rebut defendant's expert's specific conclusions. Mr. Finnerty's comments about Mr. Patchin's opinions on stigma related solely to his articles. Interestingly, plaintiffs' expert keeps three of Mr. Patchin's articles in his office as references for evaluation techniques for contaminated properties. Damages Tr. 24.

### 3. Severance Damages

Plaintiffs' expert testified that due to the monitoring wells and the EPA access order, the remainder of the subject property lost $1,055,000 in value. Mr. Finnerty's severance damages analysis is premised upon his disagreement with this court's prior factual findings. This court previously found that the "evidence shows that the value of plaintiffs' property was reduced by the contamination, rather than by the actions pursuant to the access order." 36 Fed.Cl. at 588. Plaintiffs' expert contended that the monitoring wells caused the perception that the subject property was contaminated. This court considered this same argument during the liability phase and rejected it. The monitoring wells aided in reducing the unknowns associated with contamination, such as the extent of contamination, the costs of remediation, and the owners' responsibility. Moreover, the information developed from the monitoring wells would lessen the political risks to the county authorities who would be ruling

6. In a prior appraisal of improved industrial property with soil and groundwater contamination in Los Angeles County, plaintiffs' expert decreased the value of the property by 80%. DX 959 at 5105. Mr. Finnerty noted that the current market value estimate could dramatically change as more information became known regarding the extent of the contamination and the mitigation costs. *Id.* Interestingly, defendant's expert determined that the impact from the uncharacterized contamination underlying plaintiffs' property was an 80% decrease in the property's value. DX 726 at 492.

7. During the liability phase, the court accepted Mr. Patchin as an appraiser with special expertise regarding the impact of contamination on the value of property.

8. The court notes that plaintiffs mischaracterize Mr. Patchin's theory on the impact of contamination on a property's value. Plaintiffs state in their post-trial brief, "Mr. Patchin has hypothesized that, in every instance where there is contaminated groundwater underlying real property, whether improved or unimproved, there will be an automatic diminution in value of such real property caused by an alleged 'stigma' (of contamination) affecting, and impacting, the property." Pls.' Post-Trial Brief at 30. This court has reviewed Mr. Patchin's report and articles, *see* DX 726, and finds that his theory does not automatically diminish the value of contaminated property. Mr. Patchin analyzes many factors, such as the type and severity of contamination, whether the property is improved or unimproved, whether the property is residential or commercial, the availability of substitute properties, the status of environmental assessment and remediation of contamination, and the ability to obtain financing. *See* DX 726 at 476–77.

on zoning changes and development plan approvals. Mr. Finnerty produced no evidence that the presence of monitoring wells would cause a loss in property value. It defies logic that the monitoring wells, rather than the actual existence of groundwater contamination, would devalue plaintiffs' property. The plaintiffs have not produced new evidence that warrants a reversal of this court's prior factual finding.

In addition, plaintiffs' expert relied on his own interpretation of the EPA order, rather than the actual activities that took place on plaintiffs' property, for his calculation of severance damages. Mr. Finnerty determined that the highest and best use of most of plaintiffs' property with the groundwater wells and access easements was open space. PX 2129 at 18. The court disagrees with this determination. Based on testimony from both parties' experts, this court determined that the easements could be incorporated into any planned development as parking lots or landscaped areas, without any significant loss of buildable area. 36 Fed.Cl. at 583. There is no specific evidence that the EPA would have restricted the development of plaintiffs' property. See id. Severance damages based wholly on speculation and conjecture are not recoverable. See Olson v. United States, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934). The court finds that the easements and the EPA order did not materially interfere with the subject property's daily use and did not result in severance damages.

### 4. Special Benefits

Based on the court's prior determination, Mr. Finnerty assumed that plaintiffs received a special benefit from the EPA's and California's actions in the amount of $100,000, representing the cost of a Phase Two study, which tests and analyzes contamination on a property as part of a plan of development. Hendler, 36 Fed.Cl. at 587 & n. 15.[9] With interest, the special benefit totals $195,000, which outweighs the value of the easements

by $10,000. Therefore, plaintiffs received a net benefit of $10,000.

Plaintiffs' expert disagreed with the court's finding that plaintiffs would have been required to investigate the contamination underneath the subject property. Mr. Finnerty claimed that after a lawsuit, the costs of a Phase Two study would have been borne by the parties responsible for the contamination. Damages Tr. 85–86. Mr. Finnerty's testimony at trial contradicted his conclusion that plaintiffs would not have been required to perform a Phase Two study. In August 1983, Mr. Hendler was advised that preliminary testing showed that contaminated groundwater was migrating under plaintiffs' property. Mr. Finnerty admitted that when a property is known to be contaminated, the characterization of the contamination is a critical step in obtaining the necessary governmental approvals for the development of that property. Damages Tr. 124–25. Furthermore, plaintiffs' expert agreed that during 1983 through 1986, lending institutions began to routinely require Phase One/Phase Two investigations for property that might be contaminated. Id. at 113. During the early to mid–1980s, the need to perform a Phase Two investigation would typically preclude obtaining a loan on the property. Id. Also in the same timeframe, if a lending institution required a Phase Two investigation, the owner or seller of the property would have borne the cost. Id. at 113–15. The court stands by its factual finding that due to defendant's actions, plaintiffs received a special benefit of $100,000, for the avoided cost of a required Phase Two investigation.

Mr. Finnerty did not find any special benefits from defendant's characterization and remediation of the groundwater contamination under plaintiffs' property, despite the court's factual finding that the EPA's and the State's actions taken pursuant to the EPA order enhanced the value of the subject property. See Hendler, 36 Fed.Cl. at 588. Plaintiffs' expert admitted that the impacts from the discovery of contamination and from the development of knowledge or remediation

9. During the liability phase, the court found that "[b]oth parties' experts explained that property suspected of containing contamination is investigated in two phases—usually by a highly paid consultant—when a property owner is preparing a plan of development." 36 Fed.Cl. at 587 n. 15.

were even greater in 1983 than they would be in 1994 or later because of the market's lesser level of sophistication in 1983. Damages Tr. 130. During Mr. Finnerty's deposition, he stated that the greatest amount of property value lost occurs at or near the time that contamination is discovered. *Id.* at 129–30. Over time as knowledge about the contamination increases or some mitigation occurs, that value impact tends to decrease. *Id.* 129–30. Based on Mr. Finnerty's testimony and the record, the court finds plaintiffs' expert's conclusions about the impact of characterization and remediation of the groundwater contamination on the subject property's value and the nonexistence of special benefits neither credible nor consistent with this court's prior factual findings.

## B. *Mr. Cox.*

Defendant's expert, Verne Cox, has been a real estate appraiser for almost forty years. He is a member of the Appraisal Institute, with the MAI designation. His appraisal assignments have included all types of real estate throughout Southern California. Mr. Cox analyzed the impact of the well easements on plaintiffs' property during the liability phase of trial. Mr. Cox has some experience valuing different types of easements, such as ones for sewer lines or power lines. Damages Tr. 304. Like plaintiffs' expert, Mr. Finnerty, defendant's expert stated that he did not have experience appraising the specific value of groundwater monitoring well easements.[10] *See id.* at 28, 319–20. Nevertheless, the court accepted Mr. Cox as an expert appraiser of real estate.

10. Plaintiffs argue that Mr. Cox should be disqualified as an expert because he does not have experience appraising the impact of monitoring wells under the so-called "gold standard." As previously discussed, this court did not place a "gold standard" on appraisers, requiring them to have experience appraising the impact of monitoring wells. Moreover, Mr. Cox did not state at the damages phase whether he had experience appraising the impact of monitoring wells on property. Like Mr. Finnerty, Mr. Cox has not placed a specific value on a groundwater monitoring well easement until this case.

11. The remaining areas would be used for working, turnaround, and access. Damages Tr. 303.

### 1. *Value of Part Taken*

Defendant's expert provided two values for the part taken by the well easements and access corridors. One value assumed no contamination on the subject property, the other was the contaminated value. During the liability phase, Mr. Cox appraised plaintiffs' property, assuming no contamination, and determined the unimpaired value of the easements. To calculate the value of the easements, defendant's expert first developed an unimpaired value for the entire property, using comparable sales of properties having no contamination. Based on the dimensions for the well and access easements provided by Mr. Webb, Mr. Cox calculated the unimpaired value. To do this, Mr. Cox assigned a fee value for the 5–foot square immediately adjacent to the well head, and for the remaining areas, he assigned an easement value of 25% of fee value.[11] Damages Tr. 302–03. The 25% of fee value was based on Mr. Cox's prior experience with valuing easements such as sewer line and power line easements. *Id.* at 304. Defendant's expert determined that the well easements and access corridors for each of the twenty wells were worth $14,390.

For the damages phase, Mr. Cox utilized Mr. Patchin's appraisal to determine the impaired value of the well easements and access corridors.[12] Mr. Patchin testified at the liability phase about the impact of contamination on the value of the subject property. Mr. Patchin found that the groundwater contamination reduced the subject property's value by at least 80% of its 1983 uncontaminated value. At the damages phase, Mr. Cox applied the 80% reduction to the $14,390,

12. Plaintiffs argue that Mr. Patchin is not a qualified appraiser because he has no experience appraising the impact of groundwater monitoring wells. This statement is not entirely true. Mr. Patchin has considered the impact of monitoring wells on property value. In Mr. Patchin's report, he stated that he "is not aware of *any* data which demonstrates that the presence of monitoring wells on a particular property impact[s] its value." DX 726 at 512. Mr. Patchin included a case study in his report in which the seller retained an easement for future clean-up and monitoring of the property, and the property sold at no apparent discount. *Id.* at 640–41.

unimpaired value and determined that the impaired value of the easements was $2,878.[13]

## 2. *Stigma*

Mr. Cox relied upon Mr. Patchin's analysis of contamination stigma on the value of the subject property. During the liability phase, the court accepted Mr. Patchin as an expert in the area of contamination stigma and the impact of contamination on the value of property, and his report was accepted into evidence. Mr. Patchin is an MAI appraiser who specializes in the valuation of contaminated properties and has authored numerous articles on the subject. *See* DX 726 at 533–63.

During the liability phase, Mr. Patchin analyzed the impacts from the discovery of contamination and its subsequent characterization and remediation on plaintiffs' property by comparing the subject property with dozens of other contaminated properties. Mr. Patchin has compiled data from the sales of contaminated properties and has determined that many properties are subject to stigma, which is a loss of value above the cost of remediation and clean-up. The major cause of stigma is the uncertainty associated with contamination. Mr. Patchin's case studies show that undeveloped, contaminated land tends to have the most severe stigmatization because it has no existing income flow to offset any potential future costs and because of the availability of substitute, uncontaminated property. *See* DX 726 at 562.

Mr. Patchin's report explained that the discovery of contamination on plaintiffs' property in 1983 reduced its value by 80% of its unimpaired value. Prior to the installation of the monitoring wells, the full extent of the contamination beneath plaintiffs' property was not known. Therefore, reasoned Mr. Patchin, the amount of uncertainty and panic in the marketplace would be at its greatest level. DX 726 at 490–93; Liability Tr. 5430.[14] By 1987, the characterization of the nature and extent of the groundwater con-

tamination had occurred and remediation had begun. As a result of characterization, Mr. Patchin determined that the value of plaintiffs' property rose to 40% of its unimpaired value. *See* DX 726 at 494–500. By 1995, Mr. Patchin determined that the subject property's value was restored to 80% of its unimpaired value because remediation was substantially underway and the level of contamination was significantly reduced. *Id.* at 501–05.

Mr. Cox used Mr. Patchin's calculations of contamination stigma on plaintiffs' property as a framework for determining the impaired value of the well easements and the value of the special benefits. Plaintiffs argue that Mr. Cox has no experience appraising or establishing contamination stigma on property value. Mr. Cox admitted that he had not conducted any independent study of the impact of contamination stigma and that his studies have been limited to a review of Mr. Patchin's report in this case and his articles. Damages Tr. 327–28. No evidence was presented at trial to show that Mr. Cox is prohibited from relying upon and adopting Mr. Patchin's studies in appraising the value of the well easements and the special benefits. Mr. Cox testified that his letter report, referencing his appraisal and that of Mr. Patchin, constituted a complete appraisal and conformed with the Federal Land Acquisition Appraisal Guidelines. Damages Tr. 331–32. Because this testimony about the appraisal guidelines was not rebutted by plaintiffs, the court accepts Mr. Cox's use of Mr. Patchin's calculations of contamination stigma on plaintiffs' property.

Plaintiffs tried to discredit Mr. Cox's testimony by showing that he has never appraised a property, other than the subject property, where he found a diminution in value from contamination stigma. Damages Tr. 320–21. Mr. Cox testified that he started

---

**13.** Mr. Cox's letter report, submitted during the damages phase, incorporated by reference his earlier appraisal and Mr. Patchin's appraisal. Mr. Cox testified that his letter report constituted a complete appraisal as defined by the Federal Land Acquisition Appraisal Guidelines. Damages Tr. 331–32.

**14.** Mr. Patchin's opinion of the market is consistent with that of Mr. Flavell, plaintiffs' appraiser in the liability phase. Mr. Flavell testified that the Stringfellow contamination resulted in "a lot of hysteria in the early eighties, and I think that, as more accurate information was disseminated, it had a tendency to stabilize people's attitudes." Liability Tr. 2252.

to consider Mr. Patchin's theories on contamination stigma as a result of his appraisal of Las Vegas property in 1992. *Id.* at 325. Mr. Cox did not use the Patchin analysis in the Las Vegas appraisal because stigma turned out to be not an issue. *Id.* at 318–19, 326. Plaintiffs' counsel questioned Mr. Cox about prior appraisals, which did not take into account contamination stigma. *See* Damages Tr. 321–27. Unfortunately, these prior appraisals were not submitted into evidence, so the court cannot review their entire context. Mr. Cox testified that his prior appraisal reports, except for the Las Vegas property, pre-dated the particular analysis of stigma studied by Mr. Cox. *See id.* at 324–25. It is unclear whether Mr. Cox has had the opportunity after 1992 to apply Mr. Patchin's analysis to appraisals of contaminated properties, other than the subject property. Based on the record, the court refuses to infer that Mr. Cox would not apply Mr. Patchin's stigma analysis to other contaminated properties, if warranted.

■■■ Plaintiffs contend that California law does not recognize contamination stigma as a cognizable means of diminishing the value of property. Plaintiffs rely upon a California expert on contamination law, Mr. Joel Moskowitz. *See* PX 2113. Mr. Moskowitz opined that stigma has been held noncompensable, noting the Fifth Circuit case of *Berry v. Armstrong Rubber Co.*, 989 F.2d 822 (5th Cir.1993).[15] In *Berry*, the court, applying Mississippi common law, rejected the idea that stigma caused by a public perception, without physical harm to the property, is compensable. 989 F.2d at 829. Obviously, the *Berry* opinion is not a statement of California law. Even if *Berry* applied in this case, it is distinguishable. In *Berry*, plaintiffs claimed that their groundwater had become contaminated through dumping by Armstrong Rubber. *Id.* at 823–24. The *Berry* plaintiffs failed to prove the presence of any hazardous substances on their proper-

ty to withstand summary judgment. *Id.* at 828–29. In the instant case, however, plaintiffs' property was contaminated. The contaminated groundwater under plaintiffs' property contained high concentrations of toxic chemicals.

■■■ Under California law, reputation and history of a property can have a significant effect on its value. *Reed v. King*, 145 Cal.App.3d 261, 193 Cal.Rptr. 130, 133 (1983) (holding that purchaser stated cause of action against vendor and real estate agent for failure to disclose house was site of multiple murder). The seller of property who knows of facts materially affecting the value or desirability of the property and knows that such facts are not known to the buyer is under a duty to disclose such facts. *Id.*, 193 Cal.Rptr. at 131–32. Physical defects are material facts affecting the value or desirability of property. *Id.* at 132. In August 1983, Mr. Hendler was advised that preliminary testing showed that the groundwater contamination had migrated under plaintiffs' property. Under California law, as sellers, plaintiffs had a clear duty to disclose the facts regarding groundwater contamination as a physical defect. As a result of the duty to disclose physical defects, stigma would be taken into account by the market.[16] *See Shelden v. United States*, 34 Fed.Cl. 355, 373 (1995) (allowing reduction in value due to stigma associated with property that already had an erosion and earthquake damaged structure). Moreover, "if fear of a hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value caused by that fear may be recoverable as part of just compensation." *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1447 (9th Cir.1984). The court holds that it may consider contamination stigma in this case when evaluating the fair market value of plaintiffs' property.

---

15. The court notes that unlike this case, *Berry* is not a takings case.

16. Plaintiffs' expert, Mr. Finnerty, admitted that the seller of plaintiffs' property would have a professional, moral obligation to disclose that the groundwater contamination from Stringfellow had migrated under the subject property. Damages Tr. 115–16. Plaintiffs' expert testified that he thought there was no legal disclosure requirement in 1983. Based on the court's reading of *Reed v. King*, plaintiffs' expert's opinion on the legal disclosure obligation is wrong as a matter of law.

### 3. *Severance Damages*

Defendant's expert found no severance damages due to the taking of the well easements and access corridors. Mr. Cox found that the monitoring well and access easements would not be an impediment to the development of the subject property. Mr. Cox assumed that with a precise plan of development, the wells could be relocated at no expense to the developer. Damages Tr. 316. Moreover, the existing wells could be capped at ground level. *Id.* at 303–04. Mr. Cox's opinion that there were no severance damages is consistent with this court's prior factual findings. During the liability phase, both parties' experts agreed that parking lots or landscaped areas could be planned to coincide with the areas needed for the wells. As a result, the court found that the easements did not materially interfere with the property's daily use. 36 Fed.Cl. at 584.[17] In fact, the monitoring wells enhanced the subject property's value by removing the uncertainty associated with the groundwater contamination.

### 4. *Special Benefits*

Defendant's expert found a substantial special benefit to plaintiffs' property from the characterization and remediation of the groundwater contamination. Mr. Cox relied upon Mr. Patchin's appraisal to determine the special benefits. Defendant contends that the reports of Mr. Patchin and Mr. Cox show that characterization and remediation of the contaminated groundwater conferred a special benefit on plaintiffs' property that exceeds the value of the monitoring well and access easements by over $500,000. Mr. Patchin concluded that the discovery of the contamination in 1983 reduced the value of plaintiffs' property by 80% of its unimpaired value. By 1987, Mr. Patchin determined that, as a result of the characterization of the nature and extent of the contaminated groundwater, the value of the subject property rose to 40% of its unimpaired value. By 1995, Mr. Patchin concluded that the value of the

plaintiffs' property rose to 80% of its unimpaired value because the remediation was substantially underway and the levels of contamination were significantly reduced. Mr. Patchin's analysis is consistent with the court's prior factual finding that the "actions taken pursuant to the EPA order to investigate and remediate the contamination enhanced the value of the subject property." 36 Fed.Cl. at 588. Mr. Cox used Mr. Patchin's analysis and consulted with him to calculate the special benefits from characterization and remediation.

To calculate the special benefit from characterization, Mr. Cox used his unimpaired value for plaintiffs' property in 1983 and deducted the value of the part taken for the well easements to determine the unimpaired value of the remainder. Mr. Cox then applied Mr. Patchin's finding that characterization of the contamination increased the value of the subject property from 20% of its unimpaired value in 1983 to 40% of its unimpaired value in 1987 to determine the special benefit from characterization. Because this benefit did not fully accrue until 1987, Mr. Cox used an 11% discount rate to develop a 1983 present value for the special benefit from characterization.[18] Mr. Cox calculated a characterization benefit of $280,306 as of 1983.

To calculate the special benefit from the substantial remediation, Mr. Cox used Mr. Patchin's finding that plaintiffs' property increased from 40% of its unimpaired value in 1987 to 80% of its unimpaired value in 1995. Using the same 11% discount rate, Mr. Cox calculated the 1983 present value for the substantial remediation benefit to be $244,063. Mr. Cox then added the characterization and substantial remediation benefits together to arrive at the total special benefits, which he rounded to $524,000.

Whether the court uses Mr. Cox's impaired or unimpaired value of the monitoring well easements or Mr. Finnerty's value, the result is the same. The special benefits from the investigation, characterization, and

---

17. The court notes that plaintiffs included in their trial exhibits an appraisal of well easements, which did not find severance damages because the easements could be utilized as landscaping or parking. *See* PX 2134.

18. The 11% discount rate was taken from an Appraisal Institute publication and was based on the ten-year taxable bond rate in effect in July 1983. Damages Tr. 315.

remediation outweigh any damage from the limited property interest needed to conduct those activities. Furthermore, even if the court limits the special benefits to the $100,-000 cost avoided for a required Phase Two study, the special benefits would outweigh any damage from the physical taking. Therefore, no compensation is due to plaintiffs for the physical taking.

## CONCLUSION

After careful consideration of the arguments, testimony, exhibits, and applicable law, the court concludes that plaintiffs are not entitled to compensation from defendant for the well easements and access corridors on their property. Pursuant to Rule 54 of the Rules of the U.S. Court of Federal Claims, the Clerk is directed to enter judgment accordingly. No costs.