Filed 11/20/14  Gitlin v. Howard CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ROBERT GITLIN et al.,<br><br>          Plaintiffs and Appellants,<br><br>v.<br><br>LEE HOWARD,<br><br>          Defendant and Respondent. | A138033<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG1159160) |
| ROBERT GITLIN et al.,<br>          Plaintiffs and Appellants,<br>v.<br>JACK COX et al.,<br>          Defendants and Respondents. | A138034<br><br>(Mendocino County<br>Super. Ct. No. SCUKCVG1159160) |

In 2006, plaintiffs purchased an undeveloped commercial property in Ukiah. Unable to sell the property in 2010 when a prospective buyer discovered fuel contamination, plaintiffs sued the 2006 sellers as well as a contractor who another prior owner had hired to remove an underground storage tank from the property in 1995–1996. The trial court granted summary judgment to defendant sellers and contractor on several grounds, including the ground that various statutes of limitations barred plaintiffs' claims. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1995, the property in question, on State Street in Ukiah, was owned by Sandra Phillips and Maurice Cox.  In 1997, Maurice sold his half-interest in the property to his cousin, Jack Cox (Cox).  In 2003, Phillips sold her half-interest to Nor-Cal Investment

1

Company, Inc. (Nor-Cal), whose sole shareholders were Cox and Cox's wife, Raynette. When Raynette died in 2005, her interest in Nor-Cal passed to her estate, administered by Tom Cariveau.

In 2006, Cox and Nor-Cal sold the State Street property to plaintiffs on an "as is" basis. Cox, a licensed real estate broker, acted as the sellers' agent in the transaction and disclosed his status to plaintiffs.

Before the purchase, plaintiff Robert Gitlin (who handled the purchase for all plaintiffs) reviewed Cox's seller disclosure form, which made mention of the removal of an underground fuel tank. Cox attached a copy of a June 3, 1996, letter from the California Regional Water Quality Control Board (Water Board) addressed to then-owner Phillips (and copied to, among others, Cox and the Mendocino County Health Department). The letter closed the Board's investigation of fuel detected at the time the tank was removed. The Board "confirm[ed] . . . completion of site investigation and remedial action for the underground storage tank formerly located" at the property. It also stated "no further action related to the underground tank release is required," assuming the information provided during its investigation was accurate.

In 2010, plaintiffs attempted to sell the property to the Taco Bell Group. Taco Bell hired a company, Vertex, to test the soil and prepare a report. When Vertex reported fuel contamination, Taco Bell cancelled the sale.

In 2011, plaintiffs filed suit against Phillips, Cox, Nor-Cal, and Cariveau (collectively, the sellers),[1] John Lazaro (plaintiffs' real estate agent), and Lee Howard (the contractor who removed the underground fuel tank from the property during 1995–1996). They asserted numerous claims in their first amended complaint, including: as against Cox and Nor-Cal, for breach, and alternatively rescission, of the 2006 sales contract for failing to disclose the contamination and falsely claiming the property was clean, and for fraudulent concealment of the contamination; as against Cox, Nor-Cal, and Howard, for continuing nuisance and trespass through failure to remediate and

---

[1] Plaintiffs later dismissed Phillips and Cariveau.

2

concealment of the contamination; as against Cox and Howard, for negligent remediation of the contamination; and as against Cox, for negligent misrepresentation that the property was clean and the remediation was simple, and for negligent and intentional infliction of emotional distress.[2]

### Howard's Summary Judgment Motion

Howard moved for summary judgment primarily on the ground plaintiffs' claims against him were barred by the 10-year statute of limitations set forth in Code of Civil Procedure section 337.15.[3] Howard submitted a lengthy declaration in support of his motion, and to a large extent, his version of events is undisputed.

Howard averred as follows: In May 1995, Phillips (then one of the owners of the property) hired him to remove and dispose of an underground storage tank. Permits were obtained from the Mendocino County Department of Public Health, Division of Environmental Health (Health Department), and the City of Ukiah Fire Department.

Howard began the removal work on August 2, 1995, digging up the soil where the tank was located while representatives from the Health Department and the Water Board observed. He found a 350-gallon tank. The tank was empty, but Howard smelled old gasoline nearby. Accordingly, an "Underground Storage Tank Unauthorized Release (Leak)/Contamination Site Report" was filed. Howard, with his summary judgment motion, submitted notes from a Health Department observer stating "[h]oles in bottom" "venting dry ice" "vapors smell of solvent" and "no evidence of fuel directly under the tank but . . . a gray soil with fuel smell NNE of tank."[4]

---

[2] There was no claim any of the defendants, themselves, caused the contamination. Nor was there any claim defendants, themselves, violated any statutory provisions governing underground storage tanks. (See, e.g., Health & Saf. Code, §§ 25280 et seq., 25299.10 et seq.).

[3] All further statutory references are to the Code of Civil Procedure unless indicated.

[4] As part of their opposition to both summary judgment motions, plaintiffs submitted written notes Howard, himself, had made at the time. Howard recorded: "The soil *right under* the tank showed minor color changes and little sign of gas detection . . ." but "[*t*]*wo feet under* the tank a gas smell was very strong and yellowish/red clay was

On the first day of digging, Howard took two soil samples in the presence of the inspectors. A few days later, he noticed water collecting in the pit left from the tank removal. In the presence of the Water Board observer, he "took four additional samples, including the water which had collected in the pit." On August 10, again before the Water Board observer, Howard took five more samples from the pit.

Sample locations were documented and plotted on a map and submitted to the Water Board, and all samples were delivered to a lab for testing. The lab found fuel contaminants in the two samples taken on the first day of excavation, which came from under the tank. The other samples were reported as being clean.

The Water Board then opened an investigation.

As the winter of 1995 approached, Howard, citing safety reasons and to avoid "ponding" in the pit, requested permission to backfill the excavated area with clean soil.

---

found, and the soil had turned green/gray." (Italics added.) Howard had further written that he removed the green/gray "contaminated" soil.

These notes were among over 100 pages of Water Board records attached to the declaration of plaintiffs' attorney (they were exhibits to a deposition excerpt from a deposition of a Water Board employee). Howard objected to the deposition excerpt as not identified, referenced, or described in any of the various separate statements of material fact and as irrelevant. The trial court sustained the objection. Indeed, " '[f]acts not contained in the separate statements do not exist.' " (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 175 (*Teselle*); see also *Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 572 ["Neither Kellam's declaration nor Orems testimony is referenced in the responsive separate statement. The trial court, therefore, had discretion not to consider such evidence."].) On appeal, plaintiffs maintain the records "were only submitted to show the basis for [their expert] Mr. West's statements about" these records and opinions about Howard. While an expert may rely on otherwise inadmissible materials to reach an opinion, such reliance does not imbue such materials, themselves, with evidentiary significance. (See *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524–1525 [an expert " 'may not under the guise of [stating] reasons bring before the jury incompetent hearsay evidence' "].) We discuss West's declaration, *infra*.

4

He also asked to store the excavated soil in visqueen liners. The Water Board approved these plans.[5]

In the spring of 1996, at the Water Board's request, a third-party engineer tested the excavated soil, which was still stored in the liners. Howard was not involved in this examination, and the results showed no contamination.

 "After receiving authorization to backfill the excavation with clean soil, and upon receiving the results that the soil stockpiles no longer contained measureable contaminants," Howard "backfilled the hole with the stockpiled soil."

On June 3, 1996, the Water Board issued its closure letter.

### Cox and Nor-Cal's Summary Judgment Motion

Cox and Nor-Cal also moved for summary judgment on statute of limitation grounds. They additionally maintained there was no evidence they had withheld information from plaintiffs or had knowledge of the contamination discovered in 2010.

Cox averred he had minimal involvement with the tank removal since he was not an owner of the property at that time, and he had no knowledge the property was contaminated thereafter. The only document he ever had related to the tank removal was the Water Board's June 3, 1996, closure letter, which he had assumed meant the property was clean.

Cox had the closure letter when he purchased the property in 1997. He did not believe it presented a "red flag" and did not review any Water Board records. Before he purchased the property, he was also aware of fuel contamination on property across the street that had been used as a Chevron station. He spoke with the engineer retained in connection with the remediation of that property to investigate whether a plume of fuel

---

[5] As part of their summary judgment opposition, plaintiffs also pointed to internal notes of the Water Board indicating Howard initially advised the Board he intended to backfill the pit with the excavated soil, as opposed to clean soil, stating "he was going to do what he had to do" to eliminate the pit. Another note reported Howard as saying he was not being paid to clean up the property, but to simply remove the tank. These notes were part of the Water Board records the trial court properly excluded, but which plaintiffs maintain were relied on by their expert, West.

might be extending from the site. The engineer told Cox there was no plume and that a monitoring well had been dug on the boundary of the former gas station site and tests showed no contamination migrating to the State Street property. Cox did not disclose this information about the property across the street to his realtor or to plaintiffs. By the time of the sale to plaintiffs, that property had been rebuilt and was operating as a Travelodge.

In opposing declarations, plaintiffs averred they never would have purchased the property if they had thought it was contaminated. Gitlin stated that while he received a copy of the June 3, 1996, closure letter from Cox and reviewed it, it did not cause him to believe fuel had actually been found on the property. Rather, he claimed it merely raised "questions" that prompted him to meet with Cox—a meeting Cox denies. According to Gitlin, Cox told him the property was "clean," the tank removal was "simple," and the tank "did not leak." Gitlin also stated the plaintiffs' real estate agent, Lazaro, told him the Water Board closure letter was " 'as good as a Phase I report,' " and had their agent not said this, plaintiffs would have conducted their own soil investigation.

### *The West Declaration*

Plaintiffs' opposition focused on the declaration of Brian West, an expert in "environmental assessment and remediation." West reviewed declarations and deposition transcripts, expert and lab reports, and Water Board records and reports. He also conducted his own field tests at the State Street property in 2012.

West declared that he dug a "small, exploratory test pit . . . from the location wherein . . . Howard removed an underground fuel tank" and found a noticeable smell of fuel. He observed the soil appeared contaminated because it was discolored and his field instruments measured 2,000 parts per million of volatile organic compounds. Subsequent lab tests corroborated the apparent contamination. West believed his 2012 examination focused on the spot where the tank had been removed in 1995–1996 based on the site map Vertex had used and marked during its soil study in 2010, and because West had located evidence of Vertex's boring. Based on drawings he reviewed, debris in the fill

area, perched water, and the contamination, itself, West concluded everyone had dug in the same spot.[6]

West then opined Howard must have observed the same conditions West found, and Howard, too, should have concluded there was contamination.[7] West also asserted the contamination was so significant that had the Water Board known its extent, it would have opened an investigation. West thus opined not only that "Howard simply covered the contaminated soil . . . with backfilled soil," but he did so "knowingly."

West also stated the Water Board had been trying to secure remediation of "[t]he neighboring property across the street" (which West never specifically identified) for "some time." He opined, however, in hypothetical terms, that even if testing at the property line showed clean soil, that would not indicate, one way or another, whether migration to the State Street property had, in fact, occurred.

The trial court ruled West's declaration was inadmissible and, thus, did not raise any triable issue of material fact.[8]

### The Summary Judgment Ruling

The trial court granted Howard's motion for summary judgment on the ground the 10-year statute of limitations set forth in Section 337.15 applied and plaintiffs had not presented any competent evidence raising a triable issue that the "willfulness" or "fraudulent concealment" exception to that statute applied.

---

[6] Howard disputed this and stated Vertex dug near a structure that had once been on the property, whereas he removed the tank from a "completely different location."

[7] West insinuates Howard failed to test the soil samples from beneath the tank to avoid knowledge of the contamination. West provided no basis for the asserted failure to test. Moreover, as plaintiffs ultimately conceded in their response to Howard's statement of undisputed material facts, the August 2 samples (from under the tank) had been tested and had been found to be contaminated.

[8] Citing to *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770–773 (*Sargon*) and *Kelley v. Trunk* (1998) 66 Cal.App.4th 519 (*Kelley*), the court disregarded West's opinions for several reasons, including: West had not attached any reports or laboratory results; he failed to provide sufficient foundational support for his conclusory opinions; and his opinions were based on conjecture and, thus, were speculative.

The court granted Cox and Nor-Cal's motion on several grounds. It ruled the majority of causes of action asserted against them—the first (breach of contract), fourth (fraudulent concealment), seventh (negligence), eighth (negligent misrepresentation), ninth (intentional infliction of emotional distress), tenth (negligent infliction of emotional distress), and eleventh (rescission), all based on conduct of the sale—were barred by various applicable statutes of limitation. In so ruling, the court concluded the disclosures Cox had made, which included the Water Board's June 3, 1996 closure letter, put plaintiffs on inquiry notice at the time of sale. The court also ruled the "continuing" trespass and nuisance causes of action were barred by Civil Code section 3482, given the government-approved remediation.[9]

The trial court entered judgments in favor of Howard and in favor of Cox and Nor-Cal. Plaintiffs timely appealed from both. We ordered the two appeals consolidated for decision.[10]

## DISCUSSION[11]

### The Howard Summary Judgment

Plaintiffs contend the 10-year statute of limitations set forth in section 377.15 does not bar their claims against Howard for two reasons. They first maintain Howard's

---

[9] "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." (Civ. Code, § 3482.)

[10] Howard has filed a motion to strike materials in the "Howard" appellate record that actually pertain to the "Cox" summary judgment. We understand there were two different summary judgments and have reviewed each separately, and accordingly deny the motion to strike.

[11] The standard of review on appeal from a summary judgment is well established. Summary judgment may be granted when a defendant conclusively negates a necessary element of the plaintiff's claims or establishes an affirmative defense. (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 363–364.) "Limitations issues may be resolved on summary judgment if the facts are uncontradicted and susceptible of only a single legitimate inference." (*San Diego Unified School Dist. v. County of San Diego* (2009) 170 Cal.App.4th 288, 300 (*San Diego Unified School Dist.*).) We consider all admissible evidence submitted to the trial court and view it in the light most favorable to the opposing party. (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 288–289.)

8

alleged "cover up" of the contamination with backfill was not a development or improvement of real property under the statute. (§ 337.15, sub. (a).) Second, they maintain they raised a triable issue that Howard "willfully" covered up the contamination, thus triggering the exception to the limitations period set forth in subdivision (f) of the statute. (*Id.*, subd. (f).)

"Depending on the theory of recovery, a lawsuit alleging a latent defect in the construction of an improvement to real property must be brought within three or four years after the plaintiff discovers the defect, or should have done so. (See Code Civ. Proc., §§ 337, subd. (*1*), 338, subds. (b)–(c); *Regents of University of California v. Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624 . . . (*Regents*).) However, a 1971 statute established a further general rule that no action for latent construction defects may be commenced more than 10 years after 'substantial completion' of the construction project. (§ 337.15; as enacted by Stats.1971, ch. 1569, § 1, p. 3149.) This 'absolute' 10-year limitations period applies regardless of when the defect was discovered. (*Regents, supra,* at p. 631.)" (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 366, fns. omitted.)

Specifically, section 337.15 provides in pertinent part: "No action may be brought to recover damages from any person . . . who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for any of the following: [¶] (1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property. [¶] (2) Injury to property, real or personal, arising out of any such latent deficiency." (§ 337.15, subds. (a)–(b).)

The statute is inapplicable, however, "to actions based on willful misconduct or fraudulent concealment." (§ 337.15, subd. (f).) " ' "[W]illful misconduct" . . . encompasses not only intentional wrongdoing, but negligence of such a character as to constitute reckless disregard for the rights of others.' " (*Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1296.)

9

Plaintiffs' first assertion—that Howard's backfilling of the pit that resulted from the tank removal was not "construction" under the ten-year statute—is without merit. That is so regardless of allegations that Howard "covered up" contaminated soil in the pit or used backfill that was, itself, "contaminated." (See, e.g., *Chevron U.S.A. Inc. v. Superior Court* (1994) 44 Cal.App.4th 1009, 1012 (*Chevron*) [claim for fuel contamination barred when faulty installation of fuel storage tank was over 10 years in the past]; *San Diego Unified School Dist., supra*, 170 Cal.App.4th at p. 305 [a "landfill amounts to an 'improvement' within the meaning of section 337.15"];[12] *Gaggero v. County of San Diego* (2004) 124 Cal.App.4th 609, 615, 618 ["in section 337.15, the term 'improvement' has been given a very broad interpretation" and "in filling [a landfill], covering it and selling it, the county was engaged in making the real property suitable for further use by others" and was thus improving it]; *cf. Grange Debris Box & Wrecking Co. v. Superior Court* (1993) 16 Cal.App.4th 1349, 1354 [comparing a claim for contamination outside of a construction project (to which section 337.15 would not apply) with a cross-claim for negligent contamination resulting from excavation prior to construction], disapproved on other grounds by *Lantzy, supra*, 31 Cal.4th at p. 367.)

---

[12] Plaintiffs' reliance on *San Diego Unified School Dist.* is misplaced. They assert the case holds the 10-year statute "does not apply to claims involving environmental remediation." Not so. The case takes no issue with "[t]he observation" in *Chevron*, *supra*, 44 Cal.App.4th at page 1018, footnote 4, "that section 337.15 does not contain a 'pollution exception.' " (*San Diego Unified School Dist.*, *supra*, 170 Cal.App.4th at p. 309.) Rather, the case simply distinguished between claims brought in relation to construction or improvement activity, and those that could only be fairly categorized as arising from a breach of a legal duty, such as those arising from environmental statutes or contracts. (*Id.* at p. 305.) In *San Diego Unified School Dist.*, "[t]he District's alleged harm and causation of harm [could not] be measured from the date of completion. Rather, the District is asserting its financial injury was proximately caused by breaches of arrangements reached by the parties in dealing with the property, regardless of how its condition was originally created. For this reason, we do not view the primary right asserted by the District as a right to a landfill that was constructed within the applicable standard of care." (*Id.* at p. 309.) Here, plaintiffs challenge Howard's removal of the tank and filling the pit left by the removal in 1995–1996; they do not rely on ongoing agreements or legal obligations attendant thereto, as was the case in *San Diego Unified School Dist.*

10

Plaintiffs' second assertion—that they raised a triable issue that Howard "willfully" covered up contaminated soil, triggering the exception to the 10-year statute set forth in section 337.15, subdivision (f)—depends on West's declaration. As we have recounted, the trial court ruled West's opinions as to Howard were speculative and, thus, did not constitute admissible evidence of willful misconduct or fraudulent concealment.

Recently, in the context of a pretrial evidentiary motion and hearing, our Supreme Court held: "[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion." (*Sargon, supra,* 55 Cal.4th at pp. 755, 773.) Whether this is the appropriate standard of review for evidentiary rulings made in connection with summary judgment motions, generally based on papers alone, is a question the California Supreme Court has explicitly not yet addressed. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 ["we need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"].) "[T]he weight of [lower court] authority," however, "holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694; see also *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 & fn. 4.) Under either standard, the trial court properly disregarded West's opinions.

As we have discussed, in moving for summary judgment, Howard produced evidence showing the following: He was hired to remove the tank from the State Street property. He obtained all required permits. He did the work during 1995–1996 with onsite observers from the local regulatory agencies, including the Water Board. He took numerous samples, which were tested by an independent laboratory; the later samples were reported as being clear. The Water Board retained its own expert to assess the excavated soil, which was also reported to be clear. The Water Board considered the initially detected contamination to have been remediated and issued its closure letter.

11

Plaintiffs' sole evidence in opposition was West's declaration, wherein West opined, "Howard knowingly covered up the contaminated soil I found."

Plaintiffs correctly point out an expert declaration in opposition to summary judgment must be liberally construed and need not overflow with detail. (See *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187–189 (*Garrett*).) This does not mean, however, such an expert can make conclusory assertions without explanation or support. " '[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based.' " (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123, 126–127; accord, *Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1233 ["Notably absent is any factual support for the proposition that the challenged jobsites contained asbestos during the relevant time period."]; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 531 ["Without providing some evidentiary basis for his assertion that Baldwin 'chose to continue to go towards the Jeep instead of simply moving a few steps off the sidewalk,' Clark's opinion constitutes mere conjecture."]; *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611–612 ["Lang's entire testimony [was] . . . he 'kn[e]w' that the gang had been involved in certain crimes. No specifics were elicited as to . . . where, when, or how Lang had obtained the information" and so the testimony "lacked an adequate foundation"].) An " 'expert opinion based on speculation or conjecture is inadmissible,' " and " '[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' " (*Sargon*, *supra*, 55 Cal.4th at pp. 770–771.)

These fundamental requirements applicable to determining whether an expert's opinion is of evidentiary value are the same whether the opinion is offered in opposition to or in support of a motion for summary judgment. (See, e.g., *Casey*, *supra*, 206 Cal.App.4th at pp. 1232–1236 [affirming exclusion of expert opinion plaintiff

12

submitted in opposing summary judgment as lacking proper foundation and evidentiary value].)[13]

West's declaration describes his observation of contamination at the State Street property in late 2012. It says nothing about what was observed on the property in 1995–1996, when Howard removed the tank and filled the resulting hole. Nevertheless, based *solely* on the level of contamination he observed in 2012, West opined "[t]here is no way that Lee Howard working . . . as he describe[d] in his deposition and as documented in the water board records and his own records could have failed to observe and smell the contaminated soil." And on the basis of that opinion, West further opined "Howard knowingly covered up the contaminated soil I found."

West's assertions as to Howard are wholly speculative. Even assuming West examined the spot where the tank was removed,[14] he provided absolutely no basis for concluding the contamination he saw in 2012 was the same contamination that was detected when the tank was removed in 1995–1996. He likewise provided no basis for concluding the independent testing and results overseen by the regulatory agencies in 1995-96 were incorrect and, moreover, that Howard knew they were incorrect. In short,

---

[13] Thus, plaintiffs' assertion that the trial court erred in relying in part on *Kelley*, *supra*, 66 Cal.App.4th 519—in which the appellate court stated "an expert opinion is worth no more than the reasons upon which it rests" and concluded the *moving* party's expert declaration was insufficient to "establish the absence of a material fact issue for trial" (*id.* at p. 524)—misses the mark. Although some later cases have viewed *Kelley* as applying mainly to declarations of *moving* parties (e.g., *Powell, supra*, 151 Cal.App.4th at p. 125 [moving, but not opposing, expert declaration must be detailed]), none of those cases purports to relieve an opposing expert from basic evidentiary requirements, such as avoiding assumptions, speculation, and conjecture (see *Casey, supra*, 206 Cal.App.4th at p. 1233 [assumptions, speculation, and conjecture of no evidentiary value]; *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607 [" '[E]xpert opinions . . . are worth no more than the reasons and factual data upon which they are based.' "].) Moreover, the trial court cited *Kelley* in only one portion of its analysis, that portion finding fault in the lack of underlying data (such as lab reports) on the tests West performed, an issue we need not, and do not, reach. In discussing the key issue of speculation and conjecture, the trial court appropriately cited to *Sargon*.

[14] As we have recounted, Howard disputed that West was in the right locale. For our purposes, we assume he was.

nothing in West's declaration provides a reasoned basis for correlating what he observed in 2012 with what he proclaims occurred more than a decade earlier in 1995–1996, particularly in light of the uncontradicted evidence of what did, in fact, occur at that time, including full observation and monitoring by the relevant regulatory agencies. In short, all West provided was a bare assertion, 16 years on, that Howard "knowingly" filled over contaminated soil.

As we have noted, West reviewed Water Board records, which the trial court excluded from evidence. Plaintiffs maintain these records, even if not admitted as evidence in their own right, provide ballast for West's opinions. The records, as quoted by West in his declaration, indicate Howard was concerned about the hazard posed by the open hole, determined to get it filled, and threatened to "do what he needed to do" and to use the excavated material. West maintained these notes reflected disdain toward the Water Board and threatened noncompliance with the Water Board's instructions, and thus supported his opinion that Howard deliberately covered over contaminated soil. Even assuming West's reliance on these notes was proper, there remains a chiasmic gap between any frustration Howard was expressing over the need to get the hole filled for safety reasons, and West's conclusion Howard knowingly filled over contaminated soil— particularly given that the later pit samples tested clean, the excavated material tested clean, the Water Board approved use of the excavated material, and Howard used that material. In short, West's conclusory assertions provided zero evidence that Howard did not comply with Water Board directives and approvals, let alone, that he did not comply knowing there was extant contamination.

Moreover, West's proffered opinions about Howard were no more than unsupported commentary on Howard's credibility. It is well established experts may not opine, in essence, on the credibility of a witness. (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [police officers cannot offer expert testimony about the truthfulness of a witness they interviewed]; see *People v. McDowell* (2012) 54 Cal.4th 395, 426–427 [noting judicial policy disfavoring even psychiatrists from testifying about credibility].)

14

In sum, the trial court properly ruled West's expert declaration was entirely speculative and lacked evidentiary value, and, thus, did not raise a triable issue of fact.

For the first time on appeal, plaintiffs contend Howard failed to meet his prima facie burden of producing evidence showing his entitlement to judgment because he did not, in his declaration, expressly aver that he did not "willfully" cover over or "fraudulently conceal" any contamination, and so did not affirmatively show the inapplicability of the willfulness or fraud exception to the 10-year statute. (See *Teselle*, *supra*, 173 Cal.App.4th at p. 175 [no summary judgment if moving party "'has failed to 'refute [a] tenable pleaded theor[y]' "].) In their opposition in the trial court, plaintiffs simply argued West's declaration raised a triable issue that Howard engaged in "willful misconduct" or "fraudulent concealment." They now maintain, however, that Howard's declaration, itself, fell short because it did not expressly utilize the language of the statutory exception to deny such conduct. (Compare *Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1292–1293 (*Acosta*) [defendant has no burden of production on the willfulness exception to the section 337.15 statute of repose] & *Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 651 (*Varshock*) [generally, when "an affirmative defense contains an exception, a defendant must also negate the exception as part of its initial burden on summary judgment if, but only if, the complaint alleges facts triggering potential applicability of the exception"].)

We need not resolve whether the apparent differences in view between *Acosta* and *Varshock* are of significance here.[15] Even assuming plaintiffs did not waive this challenge to Howard's evidentiary showing, and even assuming Howard was required to make a prima facie showing the exception in subdivision (f) to the 10-year statute did not apply, Howard's lengthy and detailed declaration as to what he did do—under the supervision of and in compliance with the requirements of the regulatory agencies—is a *more* than ample denial of "willful misconduct" and "fraudulent concealment." Indeed, it

---

[15] We note plaintiffs did not plead a fraud cause of action against Howard. (See *Varshock, supra,* 194 Cal.App.4th at p. 651 [generally, a defendant's summary judgment showing need only meet claims made in the complaint].)

15

is apparent plaintiffs, themselves, read Howard's declaration this way, since they argued in the trial court that, contrary to what Howard said in his declaration, West's declaration raised a triable issue that Howard had "willfully" covered over contamination.[16]

We thus conclude the trial court properly granted Howard's motion for summary judgment.

### The Cox and Nor-Cal Summary Judgment

Plaintiffs contend summary judgment was erroneously granted to the sellers because there are triable issues Cox and Nor-Cal (1) failed to disclose the nature of the contamination on the State Street property, (2) failed to disclose contamination on "neighboring" property—both in violation of a real estate seller's duty of disclosure (*Calemine v. Samuelson* (2009) 171 Cal.App.4th 153, 161)[17]—and (3) failed to remediate the contamination found during the 1995–1996 tank removal.

#### Disclosure of Contamination on the State Street Property

In granting summary judgment to the sellers on all of plaintiffs' claims apart from nuisance and trespass (i.e., breach of contract, fraud, negligence and intentional infliction of emotional distress),[18] the trial court relied on statute of limitations grounds. In so doing, it ruled plaintiffs were on "inquiry notice" as to contamination at the time of their purchase in 2006, triggering the limitations periods applicable to their various claims against the sellers. That being so, the court further ruled their claims against Cox and Nor-Cal asserted in 2011, were time-barred.

---

[16] Thus, plaintiffs' reliance on *Teslle*, *supra*, 173 Cal.App.4th at page 175, is misplaced. In that case, the defendants failed to adduce any evidence to rebut three of the plaintiffs' four theories of elder abuse. In stark contrast, Howard's declaration was lengthy and detailed and canvassed the entirety of his conduct at issue.

[17] Plaintiffs, we note, draw no legal significance, as regards the elements of their causes of action, from Cox's status as the sellers' [his and Nor-Cal's] agent in the 2006 transaction. We therefore impute none.

[18] There is no separate tort of "negligent infliction of emotional distress"; rather, actionable negligence may cause emotional distress damages. (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1520; *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984.)

"Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.] An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806–807 (*Fox*).) However, "[t]he discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have ' " 'information of circumstances to put [them] on inquiry' " ' or if they have ' " 'the opportunity to obtain knowledge from sources open to [their] investigation.' " ' [Citations.]" (*Id.* at pp. 807–808, fns. and italics omitted.)

Accordingly, *suspicion* is enough to trigger inquiry notice. " 'If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation.' " (*Wilshire Westwood Associates v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732, 740; accord, *Fox, supra,* 35 Cal.4th at p. 807 [a "plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements,' " quoting *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398]; see also *Camsi IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1537–1541 [claims against prior property owners time barred; fact regional water board in an earlier notice "so much as mentioned 'the presence of unspecified amounts' " of a contaminate on the property precluded "any possible assertion [the current owner] would have been unable, by reasonable diligence, to have discovered the necessary facts at that time"].)

This is so even when a defendant has been evasive or untruthful concerning the very conduct that would arouse suspicion. (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1153 (*Mangini*) [because the plaintiffs had notice of potential hazardous waste on property previously leased to the defendant, their negligence and strict liability claims were time barred; even though the "defendant gave evasive, or even

17

untruthful, reasons for [their later] inspection [of the contaminated property, that] did not relieve plaintiffs of their duty of inquiry once they had sufficient facts to suspect the cause of action," "[i]ndeed, the evasiveness gave further reason for suspicion"]; see also *Kennedy v. Josephthal & Co., Inc.* (1st Cir. 1987) 814 F.2d 798, 803 ["For each oral representation that Sinclair made and upon which appellants claim they relied, there was a direct refutation by the plain language of the offering memorandum," so appellants were on inquiry notice of securities fraud.].) " '[F]raudulent concealment [for tolling the statute of limitations] does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' " (*Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1460.) "[W]henever a fraudulent representation of fact is made, the party receiving it is generally entitled to rely and act on it and is not bound to verify it by an independent investigation. But this well established rule . . . applies only to the question of whether actionable fraud was initially committed. On the limitations issue, the court, in [*Seeger v. Odell* (1941) 18 Cal.2d 409], required a showing that the plaintiffs were not negligent in failing to make the discovery sooner." (*National Auto. & Casualty Ins. Co. v. Payne* (1968) 261 Cal.App.2d 403, 413; see also *Seeger v. Odell*, *supra*, 18 Cal.2d at pp. 414–415, 418 [treating justifiable reliance for purposes of proving fraud claim and running of limitations period as separate issues].)

Plaintiffs do not dispute that prior to the sale, Cox provided them with a copy of the Water Board's June 3, 1996, closure letter. They claim, however, the letter was "cryptic" and insufficient to put them on "inquiry notice" that Cox's alleged oral statements might be false. We disagree.

The Water Board's closure letter unambiguously provided notice of an unauthorized "release" from an underground storage tank, removal of the tank, and "remediation" related to the tank. It was not a mere invitation to broadly investigate potential defects, but, rather, was a highly specific notice by a public agency as to the tank removal, detected contamination, and remediation work. (Compare *Manderville v. PCG & S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1489 ["exculpatory clauses"—

18

conferring a right to investigate property—"in standardized forms used in the purchase and sale of real estate [do not] bar a claim for intentional misrepresentation brought by buyers of real property against the sellers' brokers" as a matter of law; reliance on broker's statements might be justified] and *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 166 ["By warning the Stevensons in the purchase contract that they took title subject to easements of record, Baum put them on notice of the above material facts . . . ."].)  The letter also was not "buried" in hard-to-reach agency files such that it would not reasonably have been found; rather, it was a well-disseminated public document that was also specifically provided to plaintiffs.  (See *Michelson v. Camp* (1999) 72 Cal.App.4th 955, 969–970 [knowledge imputed to plaintiff of record not buried and in hands of party].)

Plaintiffs' position reduces to the assertion they could disregard what clearly was conveyed by the Water Board's closure letter because Cox allegedly told Gitlin the tank "did not leak," its removal was "simple," and the property was "clean."  Even assuming Cox made these statements some 10 years after the closure letter was issued, the statements did not vitiate the contents of the Water Board's letter written at the time of the removal and remediation.  At the very least, the Water Board's closure letter should have raised suspicion as to Cox's alleged statements.  (See *Doe v. Roman Catholic Bishop of Sacramento* (2010) 189 Cal.App.4th 1423, 1433 (*Doe*); see also *Mangini, supra,* 230 Cal.App.3d at p. 1153.)

In *Doe*, the Diocese allegedly misrepresented that two former priests were not child molesters even though they reportedly had fled the country, one in 1989 after pleading guilty to a child molestation charge and the other in 1991 upon an accusation of child molestation.  (*Doe, supra*, 189 Cal.App.4th at pp. 1433–1434.)  "[N]either the Diocese's alleged misrepresentations nor Doe's actual ignorance of the molestations relieved Doe of the duty to investigate.  Misrepresentations are a part of every fraud cause of action; nonetheless, the duty to investigate arises if the circumstances indicate that the defendant's representations may have been false."  (*Id.* at p. 1433.)  Thus, " ' "where a party defrauded has received information of facts which should put him

upon inquiry, and the inquiry if made would disclose the fraud, he will be charged with a discovery as of the time the inquiry would have given him knowledge." ' " (*Ibid.*) Accordingly, the victim's mother's claim against the Diocese for affirmative, intentional fraud was barred as a matter of law *by the statute of limitations* and could not survive a demurrer. (*Ibid.*)

The fact Cox, himself, bought the property knowing about the Water Board's closure letter, but without doing further due diligence, does not alter the analysis. Indeed, it could be said Cox's own purchase simply evidenced his belief of what he supposedly said 10 years later—that the tank "did not leak," its removal was "simple," and the property was "clean." But, again, what Cox's own purchase might have implied as to what he believed, does not vitiate what the Water Board expressly said in its official closure letter or change the fact the closure letter put plaintiffs on notice to inquire further.

In sum, the trial court did not err in concluding plaintiffs were on "inquiry notice" at the time they purchased the property in 2006 and, thus, the statutes of limitations applicable to their claims against Cox and Nor-Cal had run by the time they filed suit in 2011. (§§ 337 [four years for breach of contract]; 338, subd. (d) [three years for fraud]; *William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1313–1314 [two or three years for negligence or negligent misrepresentation]; *Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 357 [two years for infliction of emotional distress].)

### *Failure to Disclose Contamination on Nearby Property*

Cox was also aware that property across the street from the State Street property had once been used as a Chevron service station, and that contamination had been detected and remediation efforts had been undertaken as to that property. He averred an engineer working on that remediation effort told him no contaminate plume extended from the property and there was no evidence of contamination in a monitoring well situated at the boundary of the property. Knowing this, Cox nevertheless purchased the State Street property. While Cox owned the property, the former gas station site was

20

redeveloped as a Travelodge, and it remained in use as such at the time plaintiffs bought the property.

To the extent plaintiffs' various claims are based on Cox's failure to disclose any contamination on the former gas station property, they do not suffer from the same statute of limitations problems as their other claims since the Water Board's closure letter did not pertain to that property. Nevertheless, summary judgment was proper because there is no evidence raising a triable issue that Cox had a duty to disclose what he knew about the property across the street that at one time had been a Chevron station but had been cleared and rebuilt as a Travelodge.

Plaintiffs have cited no case holding the mere fact contamination has at one time been detected on nearby property is a material fact a property owner must disclose to a prospective purchaser. Rather, the "seller of real property has a duty to disclose: 'where the seller knows of facts *materially* affecting the value or desirability of the property [to be sold] which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer.' " (*Reed v. King* (1983) 145 Cal.App.3d 261, 265.)

There is no evidence the contamination on the former gas station property, which Cox learned about before he purchased the State Street property in 1997, materially affected the value of the State Street property either then, or in 2006 when plaintiffs bought it.

West's opinions in this regard are, again, speculative. He asserted the Water Board had for "some time" been trying to secure remediation of an unidentified "neighboring" property. Putting aside that the reference to "neighboring" property is an unacceptably vague reference to the former Chevron gas station property that was across the street from the property in question, West's assertion says nothing about the extent of the contamination on the "neighboring" property or the outcome of the remediation, let alone, anything about the effect on the value of the State Street property. Plaintiffs cannot conjure up a triable issue from this, particularly since Cox, himself, bought the

21

property knowing about the former gas station property across the street, and by the time plaintiffs bought it, the property had been rebuilt and was being operated as a Travelodge.

West also opined, in hypothetical terms, that even if testing at the property line of the "neighboring" property showed clean soil, that would not tell, one way or another, whether any contamination migrated across the street to the State Street property. Even if this were correct, there is no evidence Cox knew any such thing. Rather, Cox's declaration that he was told by the engineer who helped in the remediation of the former gas station property that the monitoring well showed no migration had occurred, was uncontroverted. Furthermore, West's opinion, again, says nothing about the extent of contamination on the "neighboring" property, the outcome of the remediation work, or the affect on the value of the State Street property in 2006.

Gitlin, in turn, averred he would not have bought the State Street property had he known of the contamination on the former gas station property. Again, this bare assertion says nothing about the extent of the contamination on that property or the affect on the value of the State Street property.

In addition, there is no evidence the use history of the property across the street (a) was "known or accessible only to" Cox and (b) he knew that history was not "within the reach of the diligent attention and observation of the buyer."

In sum, there is no evidence raising a triable issue that Cox was aware of, and failed to disclose, information about contamination and remediation work on the site of the former Chevron station across the street that materially affected the value of the State Street property—let alone materially affected its value at the time plaintiffs purchased it, by which time the property across the street had been rebuilt and was being operated as a Travelodge.

### *Failure to Remediate Contamination Found in 1995–1996 Tank Removal*

Plaintiffs' remaining claims against Cox and Nor-Cal were for "continuing" nuisance and trespass. In light of the regulatory oversight of the tank removal and soil replacement, the trial court concluded these claims were precluded by Civil Code section 3482, which provides: "Nothing which is done or maintained under the express

22

authority of a statute can be deemed a nuisance." (Civ. Code, § 3482.) There is, however, a more fundamental problem with plaintiffs' continuing nuisance and trespass claims, and we therefore do not reach the issue of whether section 3482 applies.

Although nuisance liability attaches to "[e]very successive owner of property who neglects to abate a continuing nuisance" (Civ. Code, § 3483), an owner only "neglects" a nuisance with knowledge. (See *Reinhard v. Lawrence Warehouse Co.* (1940) 41 Cal.App.2d 741, 747 ["The words 'neglect' and 'omit' are not synonymous. The former imports intent and intent presupposes knowledge."]; 8 Miller & Starr, Cal. Real Est. § 23:68, fn. 8 (3d ed., 2013 update) [under *Reinhard*, "a successor landowner is not liable for his predecessor's nuisance except to the extent he had notice or knowledge of the nuisance before acquiring title to the property"]; cf. *Mangini, supra,* 230 Cal.App.3d at pp. 1131–1132 [former owner who created nuisance may be liable].)

Further, some modicum of active participation is required for both a nuisance and a trespass claim. (*Resolution Trust Corp. v. Rossmoor Corp.* (1995) 34 Cal.App.4th 93, 100 [rejecting trespass, and also nuisance, liability for previous owner of property who did not contribute to a then tenant's fuel tank leak, noting "absence of cases finding landowners liable for trespass without their active participation"].)

There is simply no evidence Cox or Nor-Cal had knowledge of any contamination on the property following issuance of the Water Board's June 3, 1996, closure letter. Thus, there is no evidence either "neglected" to abate a continuing nuisance. There, likewise, is no evidence Cox or Nor-Cal did anything that created or perpetuated the contamination detected in 1995–1996 when the tank was removed (and before they even owned the property), let alone the contamination detected in 2010 and 2012. Thus, there is also no evidence either engaged in the modicum of active participation required to impose liability for continuing nuisance or trespass.

## DISPOSITION

The judgments are affirmed. Costs on appeal to respondents.

23

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.